In re CHATEAUGAY CORPORATION,
Roemar, Inc., The LTV Corporation,
et al., Debtors.

LTV STEEL COMPANY, INC.,
et al., Plaintiffs,

v.

Donna E. SHALALA, et al., Defendants.

Nos. 86 B 11270 (BRL)–86 B 11334
(BRL), 86 B 11402 (BRL) and
86 B 11464 (BRL).
No. 93 Civ. 0554 (JSM).

United States District Court,
S.D. New York.

Dec. 15, 1993.

Karen E. Wagner, Davis Polk & Wardwell, New York City, Donald B. Ayer, Jones, Day, Reavis & Pogue, Washington, DC, for plaintiffs.

Edward Smith, Asst. U.S. Atty., S.D.N.Y., New York City, for defendant Donna E. Shalala, Secretary of Health and Human Services.

Paul A. Green, Beins, Axelrod, Osbourne, Mooney & Green, P.C., Peter Buscemi, Morgan Lewis & Bockius, David Allen, General Counsel, UMWA Health & Retirement Funds, Washington, DC, for defendant United Mine Workers of America Combined Ben. Fund.

## MEMORANDUM OPINION AND ORDER

MARTIN, District Judge:

This action challenges the constitutionality of the Coal Industry Retiree Health Benefits Act of 1992, 26 U.S.C. §§ 1 note, 9701 *et seq.* (the "Coal Act" or the "Act") under the due process clause and the takings clause of the Fifth Amendment to the Constitution. Plaintiffs seek a declaratory judgment that the Act is unconstitutional and an injunction

against its enforcement. All parties have moved for summary judgment. In addition, the defendant Secretary of Health and Human Services contends, as a preliminary matter, that this court lacks subject matter jurisdiction over the takings claim.

*Background*

Prior to 1986, plaintiffs LTV and its subsidiaries (collectively, "LTV") were engaged in the business of mining bituminous coal and were members of the Bituminous Coal Operators Association ("BCOA"). Accordingly, between 1950 and 1986, plaintiffs were signatories to a series of industry-wide collective bargaining agreements known as National Bituminous Coal Wage Agreements ("NBCWAs"), that were negotiated between the BCOA and the United Mine Workers Association ("UMWA"). The 1950 NBCWA established a trust called the United Mine Workers of America Welfare and Retirement Fund of 1950 (the "1950 fund") to provide pension, health and life insurance benefits to current and retired coal miners. Employers' contributions to this fund were made pursuant to a formula based upon the amount of coal mined by each company. The 1950 fund continued to provide health benefits to retired coal miners and their families until 1974, when the 1974 NBCWA divided the 1950 fund into four separate multi-employer benefit plans. Two of the four plans were to provide pension benefits to retired miners. The other two were to provide health and life insurance benefits. The first of these two plans, the United Workers of America 1950 Benefit Plan and Trust (the "1950 Benefit Trust"), provided health benefits to UMWA miners who retired before 1976; the second, known as the United Mine Workers of America 1974 Benefit Plan and Trust (the "1974 Benefit Trust"), provided health benefits for miners who retired in or after 1976, as well as the active work force.

Subsequently, in the 1978 NBCWA, individual employers took over responsibility for providing health benefits to active workers and post–1975 retirees, while the 1974 Benefit Trust became a safety net to provide health benefits to any retired miner whose last employer had gone out of the coal mining business.

LTV signed every NBCWA negotiated between 1950 and 1984. Throughout this period, all BCOA member employers were required to contribute to the 1950 Benefit Trust and the 1974 Benefit Trust according to formulae based either on the number of tons of coal mined or the number of hours worked by a coal operator's employees. This meant that if a company ceased coal mining operations, its contribution obligations would cease, even though its retirees would continue to receive benefits from the appropriate Benefit Trust. Thus, when plaintiffs terminated their involvement in the bituminous coal industry in 1986, their obligation to pay for their retirees' health and life insurance benefits ended, and the 1974 Benefit Trust became responsible for coverage of plaintiffs' former employees, even though LTV continued to operate as a company in other lines of business. This was confirmed in *In re Chateaugay Corp.*, 945 F.2d 1205, 1208 (2d Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992). *See also District 29, UMWA v. UMWA 1974 Benefit Plan and Trust,* 826 F.2d 280, 283 (4th Cir. 1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

During the 1980's, the 1950 and 1974 Benefit Trusts began to experience serious financial difficulties. Plaintiffs argue that this was largely a result of the terms of the 1988 NBCWA, to which they were not parties. According to plaintiffs, the 1988 NBCWA provided generous health benefits to UMWA retirees, yet called for inadequate contribution levels by the signatory employers that were certain to result in severe underfunding of the Funds that were to provide those benefits. According to the defendant Trustees of the UMWA Combined Fund (the "Trustees"), a deficit developed in the 1950 and 1974 Benefit Funds because of various factors. These included the escalating cost of health care, the declining number of companies contributing to the Funds, and, in particular, the dramatically increased number of retirees dependent on those Funds for continuing health benefits as a result of "dumping" of beneficiaries by companies like LTV that ceased coal mining operations and stopped paying benefits to their own retirees.

In response to this crisis, which threatened to deprive retired coal miners of ongoing health benefits, Congress passed the Coal Act. The Coal Act entitles all UMWA retirees and their spouses who were receiving health benefits and death benefits under the 1950 or 1974 Benefit Plans as of July 20, 1992, to receive substantially the same benefits for the rest of their lives. These benefits are to be provided by a new "Combined Fund" to be created by merging the 1950 and 1974 Benefit Funds. The Combined Fund is to be supported by contributions to be paid by all signatories to any NBCWA. The Coal Act requires all such employers (denominated "assigned operators" under the Act) to pay an annual premium to the Combined Fund at a rate calculated to cover (1) the health benefits of all beneficiaries assigned to that assigned operator by the Secretary of Health and Human Services, as having been last employed by that signatory for at least two years; and (2) a pro rata share of the health benefits payable to all beneficiaries who cannot be assigned to any other signatory because their former employer or employers have gone out of business entirely. As a signatory to all the NBCWAs negotiated between 1950 and 1984, LTV will be required to pay annual premiums into the Combined Fund over approximately the next 46 years. It has been estimated that this premium will be over $20 million in the second fiscal year of the Coal Act's operation. *See* Declaration of Donald E. Pierce, Jr. at 4, and will slowly decline over the years.

Plaintiffs contend that the obligation imposed by the Coal Act to pay premiums to the Combined Fund constitutes a taking of property without just compensation, and a deprivation of property without due process in violation of the Fifth Amendment, because it arbitrarily requires the transfer of plaintiffs' property for the benefit of a narrow group of UMWA retirees, based solely on past employment relationships that plaintiffs could not have anticipated would lead to such an obligation.

I. *Jurisdiction Over the Takings Claim*

■ The Tucker Act, 28 U.S.C. § 1491(a)(1), provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress ... or for liquidated or unliquidated damages in cases not sounding in tort." This jurisdiction is exclusive, except in cases in which the amount in controversy is less than $10,000, in which case the federal district courts have concurrent jurisdiction. *Railway Labor Executives' Assoc. v. United States,* 987 F.2d 806, 815–16 (D.C.Cir.1993). *See also Preseault v. I.C.C.,* 494 U.S. 1, 11–12, 110 S.Ct. 914, 922, 108 L.Ed.2d 1 (1990).

■ Historically, it has been understood that the Court of Claims' jurisdiction is limited to cases seeking money judgments against the United States. *See, e.g., Murray v. United States,* 817 F.2d 1580, 1582–83 (Fed. Cir.1987) (Claims Court's jurisdiction is limited to cases where the Constitution or statute requires the payment of money damages as compensation for the violation. Because nothing in the due process clause requires payment of money damages for its violation, the Claims Court does not have jurisdiction over due process claims.); *Laguna Hermosa Corp. v. Martin,* 643 F.2d 1376, 1379 (9th Cir.1981) ("The Tucker Act applies only to claims for money damages. It does not preclude review of agency action [by the District Court] when the relief sought is other than money damages."); *Gentry v. United States,* 546 F.2d 343, 355, 212 Ct.Cl. 1 (1976) ("Our authority to issue a declaratory judgment is limited.... We are authorized to do so only where 'it is tied and subordinate to a monetary award.'"); *Kennedy v. United States,* 19 Cl.Ct. 69, 75 (Cl.Ct.1989) (if the relief sought is other than a money judgment, the case must be dismissed.).

In their Complaint, plaintiffs do not seek any money judgment against the United States—only a declaratory judgment that the Coal Act is unconstitutional under both the takings clause and the due process clause of the Fifth Amendment. This is relief that the Court of Claims does not have the power to award. *Kennedy v. United States,* 19 Cl.Ct. at 75. While the Circuit Court for the District of Columbia recently held in the *Railway Labor Executives'* case that an action in

which a group of unions sought a declaratory judgment that rulings by the I.C.C. modifying the terms of a collective bargaining agreement violated the takings clause, was within the exclusive jurisdiction of the Court of Claims, even though the plaintiffs made no claim for monetary damages, 987 F.2d at 816, that court did not explain how the Claims Court could award meaningful relief in a case such as this. It also failed to distinguish the many cases like *Murray, Laguna Hermosa, Gentry* and *Kennedy,* that hold that the Tucker Act applies only to claims for money damages.

■ Moreover, the Court of Claims does not have jurisdiction to hear claims against parties other than the United States. *Kennedy v. United States,* 19 Cl.Ct. 69, 75–76 (Cl.Ct.1989) "if the relief sought is against others than the United States, the suit as to them must be ignored as beyond the jurisdiction of the Court.... Furthermore, if the maintenance of a suit against private parties is a prerequisite to the prosecution of the suit against the United States, the suit must be dismissed." (citing *United States v. Sherwood,* 312 U.S. 584, 588, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941)).

Thus, to the extent that the Trustees are necessary parties to this suit, or that any repayment of premiums paid by plaintiffs must come from the Combined Fund, the Court of Claims would be without jurisdiction to award full relief in this case. Indeed, in its decision on a motion for a preliminary injunction in a case similar to this one, the court "determined [the Combined Fund and its trustees] to be necessary to this litigation: they are charged with the responsibility of collecting and receiving the insurance premiums in question and with administering the health benefits in question." *Templeton Coal Co., Inc. v. Shalala,* TH 93–158–C (S.D.Ohio Nov. 18, 1993) at 13.

■ Consequently, it would be illogical to announce and follow a simple rule that a claim is within the exclusive jurisdiction of the Court of Claims simply because the plaintiffs have intoned the words "taking without just compensation". Instead, the claim and the relief requested must be reviewed to determine whether they are of the type that logically fall within the powers of the Claims Court.

■ In this case, the plaintiffs' "takings" claim is indistinguishable from their due process claim. As the Court stated in *Preseault v. I.C.C.,* the takings clause "is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." 494 U.S. at 10, 110 S.Ct. at 921 (citing *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 314, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987)). The very gist of LTV's claim in this case is that the requirement that they pay premiums into the Combined Fund is not "otherwise proper", but rather, arbitrary, unfair and illegal. They seek not *compensation,* but invalidation of the law that requires them to pay those premiums. Therefore, plaintiffs' "takings" claim actually is a claim of deprivation of due process and not a claim for compensation that is within the exclusive jurisdiction of the Court of Claims. Both *Alabama Hospital Association v. United States,* 656 F.2d 606, 610 (Cl.Ct.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982), and *Marrero Land & Improvement Assoc., Ltd. v. United States,* 26 Cl.Ct. 193 (Cl.Ct.1992), both of which held that the jurisdiction of the Court of Claims over a takings claim is not defeated merely because a plaintiff must make a constitutional due process argument to prevail, are distinguishable in that plaintiffs in both cases sought money damages, and thus were pursuing the "just compensation" that is at the heart of the takings clause. Therefore, both of plaintiffs' claims are within the jurisdiction of this Court.[1]

1. This finding is consistent with the courts' actions in *Barrick Gold Exploration v. Hudson,* 823 F.Supp. 1395 (S.D.Ohio 1993), and *Templeton Coal Co. Inc. v. Shalala,* TH 93–158–C (S.D.Ind. Oct. 25, 1993 and Nov. 18, 1993). In both cases, plaintiffs claimed that the Coal Act violated the takings clause and the due process clause of the Fifth Amendment. In *Barrick Gold* the district court granted summary judgment against plaintiffs on both claims, without discussing the jurisdictional issue. In *Templeton Coal,* the district court initially entered an injunction against im-

## II. *The Takings Clause Claim*

■ The three factors generally considered in determining whether an unconstitutional taking has taken place are: (1) the severity of the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

### A. *Economic Impact*

■ There is no question that the economic impact of the Coal Act on LTV is substantial. The imposed liability will extend over approximately the next 46 years, and will be over $20 million in the second fiscal year of the Act's operation. Declaration of Donald E. Pierce, Jr. at 4. This liability is not, however, of the magnitude that would, in itself, invalidate the Act. "[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Products v. Construction Laborers Pension Trust*, —— U.S. ——, ——, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993). Thus, very large obligations, or diminutions in value or net worth have been upheld on numerous occasions. *See, e.g., Connolly v. PBGC*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (25% of firm's net worth); *Concrete Pipe*, —— U.S. at ——, 113 S.Ct. at 2291 (46% of shareholder equity (due process claim)); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384, 47 S.Ct. 114, 117, 71 L.Ed. 303 (1926) (approximately 75% dimunition in value); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (92.5% diminution). Moreover, in connection with the confirmation of LTV's plan of reorganization under Chapter 11 of the Bankruptcy Code, LTV's Senior Vice President and Chief Financial Officer, K.C. Caldabaugh, stated that LTV's liability for Coal Act premiums "was included in all of

our projections and we are comfortable with the viability of the company, even if it still has to service this obligation." *See* Declaration of Edward A. Smith, dated July 26, 1993, Ex. B.

The fact that an Act has provisions intended to mitigate its economic impact also has been held to be a factor that weighs in favor of its constitutionality. *Connolly v. PBGC*, 475 U.S. at 225, 106 S.Ct. at 1026. In this case, the Coal Act does contain such provisions. First, § 9704(i)(1)(B) requires signatories of the 1988 NBCWA to make payments sufficient to cover all deficits in the 1974 Benefit Trust that accrued prior to expiration of the 1988 NBCWA. Further, § 9705(a)(1) of the Act requires the transfer of a total of $210 million from the 1950 Benefit Trust during the first three years of the Act's operation. The first $70 million transfer is to reduce the total premium of each assigned operator for the first year, 26 U.S.C. § 9705(a)(3)(A); the second and third year transfers are to be used to reduce the assigned operators' unassigned beneficiary and death benefit premiums. 26 U.S.C. § 9705(a)(3)(B). In addition, in subsequent years until 2004, interest earned by the Abandoned Mine Reclamation Fund is to be transferred to the Combined Fund to reduce unassigned beneficiary premiums. 30 U.S.C. § 1232(h). In fact, these transfers will eliminate all unassigned beneficiary premiums and death benefit premiums during the first two years of operation of the Coal Act. Pierce Declaration at 5.

Finally, the amount of the payments required of plaintiffs are directly related to the number of beneficiaries of the Combined Fund that were, in fact, employed at one time by plaintiffs, and are proportionate to plaintiffs' activities under the NBCWAs. *See Templeton* decision of November 18, 1993 at 23. Thus, the economic impact of the Coal Act on plaintiffs is not such that it can be held to violate the takings clause of the Fifth Amendment. *See also Barrick Gold Explo-*

plementation of the Act pending resolution of that action, again without discussing the court's jurisdiction over the takings claim. On November 18, 1993, it rescinded its injunction as incor-

rectly granted, noting that no significant challenge to the court's jurisdiction over that suit had been raised. *Templeton Coal*, decision of Nov. 18, 1993 at 14.

*ration, Inc. v. Hudson*, 823 F.Supp. 1395, 1408–09 (S.D.Ohio 1993).

### B.  *Interference with Investment-backed Expectations*

LTV argues that every NBCWA signed by plaintiffs expressly limited its obligation to pay premiums for health and life insurance benefits for its retirees to the term of the relevant NBCWA. This, plaintiffs argue, was confirmed by numerous court decisions, including *In re Chateaugay Corp.*, 945 F.2d 1205 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992). Furthermore, plaintiffs point out, even though several NBCWAs signed by LTV contained "evergreen clauses" that required continuing contributions by coal operators who did not sign later NBCWAs, since all NBCWAs calculated premiums owed on the basis of either the amount of coal mined or the number of hours worked by a coal operator's employees, it was guaranteed that an operator would have no obligation to pay premiums to the Benefit Trusts after it ceased coal mining operations. Accordingly, LTV claims that after it left the coal mining industry in 1986, it had a reasonable investment-backed expectation that it had fully discharged its obligations to pay for health benefits for its retirees.

It is clear, however, that the NBCWAs cannot protect LTV from new legislatively imposed obligations. "Contracts, however express, cannot fetter the constitutional authority of Congress.... Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Concrete Pipe*, —— U.S. at ——, 113 S.Ct. at 2290. Furthermore, over a period of over twenty years, LTV signed a series of NBCWAs that provided that its retirees would be entitled to health benefits "for life". *See District 29 v. 1974 Benefit Plan & Trust*, 826 F.2d 280, 283 (4th Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *UMWA v. Nobel*, 720 F.Supp. 1169, 1178 (W.D.Pa.1989); *Grubbs v. UMWA*, 723 F.Supp. 123, 128 (W.D.Ark.1989); *Barrick Gold Exploration, Inc. v. Hudson*, 823 F.Supp. 1395, 1405 (S.D.Ohio 1993); *Templeton Coal Co., Inc. v.*

*Shalala*, decision of Nov. 18, 1993, at 6. While it is true that pursuant to the relevant NBCWAs, LTV would have expected that other operators would be required to pay for those benefits for its retirees, it also could reasonably have realized that the escalating cost of health care, coupled with the dwindling number of operators remaining in the coal mining industry and increasing number of "orphan" retirees as operators, including itself, left the industry, would eventually make it impossible for the 1974 Benefit Trust to provide those benefits.

Thus, given the extensive governmental involvement in and regulation of the coal industry over the years, and of the benefits field generally, one could reasonably foresee that the government might take action at some point to ensure that the Benefit Trust would remain solvent and capable of meeting its obligations. That such action might include a requirement that coal operators and former coal operators fund the lifetime benefits to which their retirees were held to be entitled, was even more predictable in light of the imposition of retroactive liability under the Multiemployer Pension Plan Amendment Act ("MPPAA") to pay benefits to former employees who were found to suffer from Black Lung Disease. The MPPAA was upheld against constitutional challenge in *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), *Connolly v. PBGC*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), and *Concrete Pipe v. Construction Laborers Pension Trust*, —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).

Finally, to the extent that plaintiffs claim to have relied on court decisions that held that a coal operator's responsibility to fund health benefits for its retired employees under any NBCWA terminated with the expiration of that NBCWA (*see, e.g., In re Chateaugay, supra*, and the numerous cases cited at page 8, note 5 of Plaintiffs' Memorandum of Points and Authorities in Support of its Motion for Summary Judgment), plaintiffs fail to state what *investment-backed* decisions they made in reliance thereon. They clearly did not sign any NBCWA on the basis of such reliance because all of the cases cited

were decided after LTV signed the last NBCWA to which it was a party in 1974.

Therefore, the court concludes that the Coal Act does not interfere with plaintiffs' realistic investment-backed expectations.

## C. Character of the Governmental Action

■ While it is true that the Coal Act compels the payment of funds of which plaintiffs are completely and permanently divested, the government has not physically invaded LTV's property or permanently appropriated its assets for its own use. *See Concrete Pipe & Prods. v. Construction Laborers Pension Trust,* — U.S. —, —, 113 S.Ct. 2264, 2290, 124 L.Ed.2d 539 (1993). "It is well settled that a 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Keystone Bituminous Coal Assoc. v. DeBenedictis,* 480 U.S. 470, 488, 107 S.Ct. 1232, 1243, 94 L.Ed.2d 472 (1987). The Coal Act clearly falls into the second category—an attempt to adjust the benefits and burdens of economic life to promote the common good.

Plaintiffs contend, to the contrary, that apart from constitutionally permitted taxation, forced transfers of funds have been permitted only in limited situations. Specifically, plaintiffs claim that such a transfer is permissible only if (1) plaintiffs are compensated in some other part of the legislation involved, (2) the transfer seeks to vindicate independently arising contractual obligations, or (3) the transfer is intended to compensate for harm caused by the transferor or the transfer is ordered pursuant to the police power to restrict the use of property injurious to the health or safety of the community. While it clearly is true that the cited cases proffer the listed reasons to justify forced transfers of funds, LTV has cited no case, and this court has found none that states that these are the only available justifications for legislation or other government action that results in the transfer of money from one party to another.

Plaintiffs also contend that the Coal Act does not really benefit the common good. Instead, they claim, it benefits only a small and select group of retired coal miners. This argument ignores, however, the fact that the Coal Act was passed in response to the 1990 Coal Commission Report to the Secretary of Labor, which found that concern over retired coal miners' health benefits was a key issue in the strike that shut down the nation's coal fields for ten months in 1989, and was crucial to the stability of the coal industry generally.

Consequently, plaintiffs have not shown that the nature of the governmental interference with their property that results from the operation of the Coal Act is of the sort that would support a finding that the Act effects a taking without just compensation. Consequently, the plaintiffs' takings claim is dismissed.

## III. The Due Process Claim

■ "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *PBGC v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984) (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). Thus, economic legislation will withstand a due process challenge if the means chosen bear a rational relationship to a legitimate governmental purpose. *Id.* 467 U.S. at 728–31, 104 S.Ct. at 2717–18; *Duke Power v. Carolina Env. Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 2635–36, 57 L.Ed.2d 595 (1978); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). Plaintiffs claim that the Coal Act is, in fact, arbitrary and irrational in that it requires former coal operators, like themselves, who in the past voluntarily provided their employees with limited health benefits pursuant to time-limited contracts that have long since been fully performed and terminated, to now provide not only some of those former employees, but also a number of re-

tired miners who never worked for plaintiffs, with health benefits for life. Plaintiffs argue that there is no rational relationship between their past acts in this regard, which they rationally understood to create no future obligations once the contracts that they signed had expired, and the duty that has now been imposed upon them under the Coal Act. The Supreme Court has stated, however, that "[O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.... This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust,* — U.S. ——, ——, 113 S.Ct. 2264, 2287, 124 L.Ed.2d 539 (1993); *PBGC v. R.A. Gray & Co.,* 467 U.S. 717, 728, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984).

The problem with plaintiffs' claim that there is no rational relationship between its past payments for its former employees' health benefits and the requirement that it now pay for those benefits, and those of certain orphan beneficiaries, for the balance of those beneficiaries' lives, is that at least between 1974 and 1986, LTV was signatory to a series of NBCWAs that included language that gave retired coal miners a legitimate expectation of lifetime health benefits. *See, e.g., In re Chateaugay Corp.,* 945 F.2d at 1210; *District 29, UMWA v. UMWA 1974 Benefit Plan and Trust,* 826 F.2d 280, 282 (4th Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *UMWA v. Nobel,* 720 F.Supp. 1169, 1178 (W.D.Pa.1989), *aff'd,* 902 F.2d 1558 (3rd Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991); *Templeton Coal Co., Inc.,* TH 93–158–C (Nov. 18, 1993 S.D.Ind.) at 6. While LTV might well have expected that other coal operators would be required to pay for those benefits after LTV left the coal mining industry, LTV also could reasonably have anticipated that the 1950 and 1974 Benefit Trusts would not be able to support the financial burdens imposed upon them as a result of escalating health care costs, the aging of the beneficiary population and the "dumping" of beneficiaries into the 1974 Benefit Trust, both by companies going out of

business totally and companies who, like LTV, ceased coal mining operations but remained in business in other industries. Moreover, since LTV's retirees became "orphans" and were "dumped" into the 1974 Benefit Trust in 1987, the remaining signatories to the 1984 NBCWA and 1988 NBCWA were forced to support those retirees' health benefits, and those "orphans" added to the overall situation that led to the inability of the Benefit Trust to meet its obligations. Now Congress has legislated that all of the BCOA members that employed the beneficiaries of the Benefit Trusts pay for the lifetime benefits that those beneficiaries were promised.

There is nothing irrational or arbitrary in Congress' placing liability for paying for the lifetime health benefits promised to the beneficiaries of the Combined Fund on all those who collectively made that promise. Presumably, LTV also benefitted from that promise during the collective bargaining that led up to agreement regarding each of the NBCWAs that it signed, and benefitted from the ongoing existence of the UMWA labor pool that existed throughout those years, at least in part as a result of the benefit packages that were incorporated in the NBCWAs. There also is nothing arbitrary in the requirement that a former coal operator whose past actions contributed to a crisis that Congress found to threaten interstate commerce be required to contribute to the legislatively chosen solution to that problem. *Compare Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust,* — U.S. at ——, 113 S.Ct. at 2287. *See also Barrick Gold Exploration, Inc. v. Hudson,* 823 F.Supp. 1395, 1407 (S.D.Ohio 1993) ("The requisites of due process are met when Congress devises a scheme that rationally spreads the cost of solving a problem among those responsible for creating it.").

■■■ LTV also complains that the Coal Act is retroactive in that it imposes obligations based on past relationships and obligations. It then argues, correctly, that the justifications for prospective application of legislation may not be sufficient to justify the retrospective application of that same legislation. *Usery v. Turner Elkhorn Mining Co.,*

428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976). This is because "[r]etroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions." *General Motors Corp. v. Romein*, —— U.S. ——, ——, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992).

 First, it is not clear that the Coal Act is, in fact, retroactive legislation. A statute is not retroactive merely because it imposes current and future obligations based on past acts. *Reynolds v. United States*, 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934); *United States v. South Carolina Recycling and Disposal, Inc.*, 653 F.Supp. 984, 996 (D.S.C.1984), *aff'd in part, vacated and remanded on other grounds sub nom. United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

In any event, even if the Coal Act is retroactive in its application, "the strong deference accorded legislation in the field of national economic policy is no less applicable when the legislation is applied retroactively." *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 728, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984). "Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *Id.* 467 U.S. at 728–31, 104 S.Ct. at 2717–18. Accordingly, it is not for this Court to determine whether the means chosen by Congress to effect a legitimate end are the best possible. This Court has no trouble determining, however, that the creation and funding of the Combined Fund constitutes a legitimate legislative purpose and that the means chosen, for the reasons stated above, are not irrational or arbitrary.

For the reasons stated, plaintiffs' motion for summary judgment is denied; defendants' motions for summary judgment are granted, and the complaint is dismissed.

SO ORDERED.