**UNITY REAL ESTATE CO., Plaintiff,**

**v.**

**Marty D. HUDSON, et al., Trustees of the UMWA Combined Benefit Fund, and Marty D. Hudson, et al., Trustees of the 1992 UMWA Benefit Plan, Defendants.**

Civ. A. No. 93–1802.

United States District Court,
W.D. Pennsylvania.

June 7, 1995.

Robert L. Eberhardt, Asst. U.S. Atty., Pittsburgh, PA.

Thomas A. Smock, David J. Laurent, Polito & Smock, Pittsburgh, PA.

Peter Buscemi, Dean C. Berry, Morgan Lewis & Bockius, Washington, DC.

David W. Allen, UMWA Health and Retirement Funds, Washington, DC.

John R. Mooney, Beins Axelrod Osborne, Washington, DC.

Ralph Finizio, Houston Harbaugh, Pittsburgh, PA.

Brian G. Kennedy, Dept. of Justice, Washington, DC.

## OPINION AND ORDER

D. BROOKS SMITH, District Judge.

### I. *Introduction*

This matter currently is before the Court on the motion of plaintiff Unity Real Estate

Co. ("Unity") for a preliminary injunction (Docket No. 4). Unity seeks to restrain enforcement of the Coal Industry Retiree Health Benefit Act of 1992, Pub.L. 102–486, 106 Stat. 2776, 3036–56 (codified at 26 U.S.C. §§ 9701–9722) (the "Coal Act"), by the defendants, the Boards of Trustees of the UMWA Combined Benefit Fund and the 1992 UMWA Benefit Plan. Unity claims that the Coal Act, as applied, violates the Substantive Due Process and Takings Clauses of the Fifth Amendment.[1] In addition, Unity argues that the liabilities imposed upon it pursuant to the Act were done without procedural due process. Because Unity's challenges to the Coal Act are based on claims that the Act is unconstitutional, the United States has intervened in support of the Act's constitutionality.

Unity's motion was referred to Magistrate Judge Keith A. Pesto, pursuant to the Magistrates Act, 28 U.S.C. § 636(b)(1), and subsections 3 and 4 of Local Rule 72.1 for Magistrate Judges. On December 7, 1994, Magistrate Judge Pesto issued his Report and Recommendation, in which he rejected Unity's due process arguments, but recommended that an injunction issue based on his conclusion that the Coal Act, as applied to Unity, "effects an uncompensated taking, and is therefore unconstitutional." Docket No. 26, at 840.

Pursuant to 28 U.S.C. § 636(b)(1), all parties filed written objections to the Report and Recommendation. Unity objected to the conclusion that the Coal Act did not violate the substantive component of the Due Process Clause. The United States and the defendant Trustees objected to the Magistrate Judge's Takings Clause analysis, and also contended that he had improperly found irreparable harm based on financial injury alone. No party objected to the Magistrate Judge's conclusion that the procedural due process challenge to the Coal Act would not support the issuance of a preliminary injunction.[2] All of the parties filed supplemental evidentiary materials as well as extensive briefs in support of their objections to the Report and Recommendation.

On January 11, 1995, the Magistrate Judge issued an Amended Report and Recommendation. Docket No. 42. In the Amended Report and Recommendation, the Magistrate Judge considered the additional factual and legal submissions, and adhered to his original recommendation that "the Coal Act as applied to Unity is so palpably unconstitutional that a preliminary injunction should issue against the enforcement of the Act against it." Docket No. 42, at 841.

In response to the Amended Report and Recommendation, the parties again filed lengthy briefs.[3] For the reasons set forth below, I agree with the Magistrate Judge's conclusions that the Coal Act, as applied to Unity, does not violate the Substantive Due Process Clause, but that the Act does effect an uncompensated taking in violation of the Fifth Amendment. Unity's request for a preliminary injunction shall be granted.

## II. *Findings of Fact*

This Court, in large part, adopts the unchallenged findings of fact as set forth by the

---

1. The Fifth Amendment provides, in relevant part: "No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend V.

2. Because Unity has abandoned its procedural due process attack on the Coal Act (at least for purposes of the motion for preliminary injunction), the Court will not address that argument.

3. This Court notes that the United States' Objections and Brief in Support of Objections to the Amended Report and Recommendation (Docket Nos. 45 and 46) contain several flippant and unprofessional attacks on the Magistrate Judge's conclusion that a preliminary injunction should

issue. *See, e.g.,* Docket No. 46, at 4 n. 3. The instant action presents a number of difficult constitutional questions. Even courts which ultimately agreed with the United States' position have grappled with the complexity of the issues. *See, e.g., In re Blue Diamond Coal Co.,* 174 B.R. 722, 729 (E.D.Tenn.1994) ("This Court has no more idea than the *Templeton* court [*Templeton Coal Co., Inc. v. Shalala,* 855 F.Supp. 990 (S.D.Ind.1993)*]* where the line should be drawn in constitutional challenges to economic legislation. If the super-reachback provision of the Coal Act does not cross the line, it must step right up to it."). In many places, the United States' brief generates more heat than light. It should go without saying that the government's position is not enhanced by belittling the Magistrate Judge's conclusions.

Magistrate Judge in his Report and Recommendation. Docket No. 26, at 836–837. Although the United States argues that it objects to certain of the Magistrate Judge's findings of fact (*see* Docket No. 46, at 2–3), those objections are more properly characterized as challenges to legal conclusions (*e.g.,* whether certain beneficiaries should be considered "orphan retirees"; whether there exists any "employment connectedness" between Unity and the assigned beneficiaries).

Unity is a corporation owned by members of the Jamison family, and it owns a small commercial building and parking lot in Greensburg, Pennsylvania. Unity employs two individuals, an officer at a salary of $7,200 per year, and a janitor. Its annual gross revenues are approximately $50,000 and its net worth is approximately $85,000.

Unity was incorporated in 1947, and in 1969 was the surviving entity after a merger with three inactive coal companies: Stewart Coal & Coke, Penn View Coal, and South Union Coal Company. Like Unity, South Union was a Jamison family-owned company, which had incorporated in Pennsylvania in 1922. From 1922 through 1960, South Union operated at various times two coal mines in southwestern Pennsylvania and one mine in northern West Virginia. From 1961 until 1969 (when it merged with the other companies and became Unity), South Union mined no coal.

The parties appear to agree that Unity also is the statutory successor to two additional coal producers: Jamison Coal Company and Moremet Coal Company.

In 1974, Unity incorporated a wholly-owned subsidiary in West Virginia, also named South Union Coal Company, to re-open the mine formerly operated by the Pennsylvania-incorporated South Union. South Union (West Virginia) operated the mine in West Virginia formerly operated by South Union (Pennsylvania) from 1974 until 1981, when it went bankrupt.

South Union (Pennsylvania) was a member of the Northern West Virginia Coal Association, which was a signatory to the 1950, 1951, 1952, 1955, 1956, and 1959 National Bituminous Coal Wage Agreements ("NBCWA")

through its membership in the Bituminous Coal Operators Association ("BCOA"). South Union (West Virginia) was a member of the Western Pennsylvania Coal Operators Association, a member of the BCOA, and thereby a signatory of the 1974, 1978, and 1981 NBCWAs. When South Union (West Virginia) went into bankruptcy in 1981, it petitioned for leave and was granted leave by the bankruptcy court to reject its obligations under the 1981 NBCWA.

In October 1993, Unity received a letter from the defendant Trustees of the Combined Fund informing Unity that it had been assigned 78 beneficiaries under the Coal Act for which it was obligated to pay a premium of $96,158.84 for the first partial year of operation of the Combined Fund—from February 1, 1993 to October 1, 1993. Unity was advised that for the second year, from October 1, 1993 to September 30, 1994, it was assigned 76 beneficiaries at a premium of $170,681.08. Payment of the premiums was to be made in monthly installments; failure to pay premiums on a timely basis subjects Unity to fines of up to $100/day per beneficiary. Unity does not have the cash on hand to pay even the first month's premium, and its net worth is less than its first year obligations.

Unity was assigned beneficiaries on the basis that the beneficiaries, or their deceased parents or spouses in the case of survivor beneficiaries, had last worked for South Union (Pennsylvania) or South Union (West Virginia) pursuant to a NBCWA.

### III. *The Coal Act*

The constitutionality of the Coal Act has been carefully considered—and upheld—by a number of courts. *See, e.g., In re Chateaugay Corp.,* 53 F.3d 478 (2d Cir.1995) (affirming district court's decisions upholding the constitutionality of the Coal Act and holding that LTV Steel's Chapter 11 bankruptcy protections did not operate to relieve it of its Coal Act obligations); *Barrick Gold Exploration, Inc. v. Hudson,* 47 F.3d 832 (6th Cir. 1995) (Coal Act does not violate Substantive Due Process Clause or Takings Clause to the extent that it fails to grant former operators refund, credit or offset for their contractual

withdrawal liability payments and their transition rule payments); *Templeton Coal Co. v. Shalala*, 882 F.Supp. 799 (S.D.Ind.1995) (rejecting plaintiffs' constitutional challenges to the Coal Act and granting defendant's cross-motion for summary judgment); *In re Blue Diamond Coal Co.*, 174 B.R. 722 (E.D.Tenn. 1994) ("super-reachback" provision of Coal Act not violative of Substantive Due Process or Takings Clauses).

"In passing the Coal Act, Congress removed the subject of health benefits for current UMW retirees from the collective bargaining process and dealt with it legislatively instead." *Barrick*, 47 F.3d at 834. The extensive political and social history which led to the passage of the Coal Act, set forth in detail in *In re Chateaugay Corp.*, 53 F.3d at 480–86, is quite lengthy and will not be reiterated here. As Magistrate Judge Pesto succinctly put it: "Congress passed the Coal Act to spread the costs of UMWA benefit plans established and funded by the NBCWAs since 1950. Congress did this by imposing liability for the lifetime health (and other) benefits promised in the NBCWAs to members of the UMWA on entities that had previously signed NBCWAs but which were no longer currently operating under a NBCWA." Docket No. 26, at 837.

The "essential thrust of the Coal Act" was an attempt by Congress to address the financial crisis facing the health benefit plans for UMWA retirees—by identifying "persons most responsible" for "plan liabilities." *In re Chateaugay*, 53 F.3d at 485.

The [Coal] Act merged the existing 1950 and 1974 Benefit Trusts into a new private trust fund, the UMWA Combined Benefit Fund ("Combined Fund"). 26 U.S.C. § 9702. Only those retirees actually receiving benefits from the Benefit Trusts as of July 20, 1992, were declared eligible to receive benefits from the Combined Fund. *Id.*, § 9703(f). In allocating financial responsibility for costs of the Combined Fund, Congress determined that "those companies which employed the retirees in question, and thereby benefitted from their services, will be assigned responsibility for providing the health care benefits promised in their various collective bargaining agreements." 138 Cong.Rec. S17,-603 (daily ed. Oct. 8, 1992) (reproducing proposed conference committee report). Accordingly, Congress directed the Secretary of Health and Human Services to levy annual health insurance and death benefit premiums on each "assigned operator." 26 U.S.C. §§ 9704, 9705. An "assigned operator" was defined as a signatory to any NBCWA since 1950. *Id.*, § 9701(c)(5). The Secretary of Health and Human Services "assigned" each beneficiary to the signatory operator for whom he or she most recently worked when possible, otherwise to the signatory operator that longest employed the beneficiary. *Id.*, § 9706. Where the signatory operator is no longer in business, the liability for its beneficiaries passes to "related persons," such as successors in interest. *Id.*, §§ 9704(a), 9701(c)(2). The costs of providing health care benefits to the remaining unassigned "orphans" were divided among the assigned operators in proportion to their share of the assigned beneficiaries. *Id.*, § 9704.

In sum, the annual premium for an assigned operator equals the sum of the cost of providing health benefits to the company's assigned beneficiaries, its pro rata share of death benefit coverage, and its pro rata share of the cost of health benefits for "orphaned" beneficiaries. The Coal Act restricts liability for medical benefit premiums to companies that (1) signed one or more Wage Agreements between 1950 and 1988, (2) continue to "conduct[ ] or derive [ ] revenue from any business activity, whether or not in the coal industry," and (3) actually employed at least one retiree currently receiving benefits. *Id.* § 9701(c).

*In re Chateaugay*, 53 F.3d at 485–86.

IV. *Conclusions of Law*

A. *Standards for Preliminary Injunction*

"In order to support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm." *Bradley v. Pittsburgh Bd. of Education*, 910 F.2d 1172, 1175 (3d

Cir.1990) (citation omitted). "Additionally, the district court should consider the effect of the issuance of a preliminary injunction on other interested persons and the public interest." *Id.* (citation omitted).

■ In order to prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following trial.'" *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994) (citations omitted). Mere economic loss "does not constitute irreparable harm." *Id.* Where the evidence shows the probability that the movant will suffer bankruptcy as a result of the challenged conduct, however, injunctive relief may be necessary to prevent irreparable injury. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975).

■ In this action, it is undisputed that the Coal Act, as applied to Unity, will result in Unity's bankruptcy within the first several months of payments under the Act. The Court finds that such a result constitutes irreparable harm.

■ With respect to the "public interest" and the "effect on third parties," the Court agrees with the Magistrate Judge that these factors "weigh neither in favor of or against issuance of an injunction." Docket No. 26, at 836.

The Court, therefore, must determine whether Unity has demonstrated a "likelihood of success on the merits." In ruling on Unity's constitutional challenges to the Coal Act, it is important to maintain a clear analytical distinction between the Substantive Due Process challenge and the Takings challenge. At times, both the parties and the Magistrate Judge blur the distinctions between the two clauses (and the cases decided

under the clauses) in their arguments and conclusions.[4]

### B. *Substantive Due Process Challenge*

■ The Coal Act, as applied to Unity, does not violate the Substantive Due Process Clause. This conclusion is compelled by the Supreme Court's decision in *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (employer withdrawal liability under the Multiemployer Pension Plan Amendments Act (MPPAA), as applied to plaintiff, did not violate Substantive Due Process Clause or Takings Clause).

In *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), and *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), the Supreme Court had previously upheld the MPPAA against constitutional challenges under the substantive component of the Due Process Clause and the Takings Clause. The *Concrete Pipe* Court held that the employer's Substantive Due Process challenge must be rejected pursuant to the Court's decision in *Gray,* as well as the Court's decision in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (rejecting Due Process challenge to Title IV of the Federal Coal Mine Health and Safety Act of 1969, which required operators to compensate miners with Black Lung who left employment in the industry before the effective date of the Act, and the survivors of such employees).

■ The Court in *Concrete Pipe* explained the extremely deferential standard to be applied in Substantive Due Process challenges—the party challenging the legislation must "establish that the legislature has acted in an arbitrary and irrational way." —— U.S.

---

4. *See, e.g.,* Report and Recommendation (Docket No. 26), at 840 ("The Coal Act, as applied to Unity Real Estate, is far closer to the general and unconnected imposition of liability questioned in *Connolly* by Justice O'Connor and condemned by both the conservative and liberal justices in *Railroad Retirement Board v. Alton R. Co.,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935) than to the imposition of either limited employment-con-

nected liability upheld in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) or to the temporally limited retroactive increases in tax liability upheld in *United States v. Carlton,* —— U.S. ——, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994), and in pension liability upheld in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) and *Connolly.*")

at ——————, 113 S.Ct. at 2287–88. The Court stated:

> In determining whether the imposition of withdrawal liability is rational, then, the relevant question is not whether a withdrawing employer's employees have vested benefits, but whether an employer has contributed to the plan's probable liability by providing employees with service credits. When the withdrawing employer's liability to the plan is based on the proportion of the plan's contributions (and coincident service credits) provided by the employer during the employer's participation in the plan, the imposition of withdrawal liability is clearly rational.

As the Supreme Court held in *Concrete Pipe, Gray,* and *Usery,* as long as Congress has acted rationally, the legislation withstands scrutiny under the Due Process Clause. The *Usery* Court specifically noted that the *wisdom* of Congress' actions is not an appropriate inquiry for purposes of Substantive Due Process analysis:

> The Operators do not challenge Congress' power to impose the burden of past mine working conditions on the industry. They do claim, however, that the Act spreads costs in an arbitrary and irrational manner by basing liability upon past employment relationships, rather than taxing all coal mine operators presently in business....
> In essence the Operators contend that competitive forces will prevent them from effectively passing on to the consumer the costs of compensation for inactive miners' disabilities, and will unfairly leave the burden on the early operators alone.
> .... But even taking the Operators' argument at face value, it is for Congress to choose between imposing the burden of inactive miners' disabilities on all operators, including new entrants and farsighted early operators who might have taken steps to minimize black lung dangers, or to impose that liability solely on those early operators whose profits may have been increased at the expense of their employees' health. We are unwilling to assess the wisdom of Congress' chosen scheme by examining the degree to which the "cost-savings" enjoyed by operators in the pre-enactment period produced "excess" profits, or the degree to which the retrospective liability imposed on the early operators can now be passed on to the consumer. It is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension.

428 U.S. at 18–19, 96 S.Ct. at 2893–94.

Given the holdings of *Concrete Pipe, Gray,* and *Usery,* and in light of the extremely deferential standard utilized by the Supreme Court, this Court agrees with the Magistrate Judge's conclusion that the Coal Act, as applied to Unity, does not violate the Substantive Due Process Clause. As the district court in *Blue Diamond* explained,

> What these cases [Supreme Court precedent] tell us is that, in order to mount a successful due process challenge to the Coal Act's super-reachback provision, [the plaintiff] must show that there is no rational relationship between that part of the legislation and an appropriate government goal. In other words, it must show that there is nothing in its past conduct that would make it rational to consider it "responsible" for the "plan liabilities." This it cannot do.
>
>     *     *     *     *     *     *
>
> [T]he actual Congressional finding which is mentioned in the legislation is not that [the plaintiff] and others like it had actually promised [lifetime] benefits but that they bore "responsibility" for the "plan liabilities." There is no doubt that, to some extent, they did. By ceasing to contribute to the UMWA trust fund after its contractual requirement to do so had expired, [the plaintiff] created some of the "orphans" who became the responsibility of the remaining contributing operators. These orphaned miners continued to draw upon the funds and contributed to their financial instability.

*Blue Diamond,* 174 B.R. at 726.

Although reasonable minds certainly may differ over the wisdom of the means chosen by Congress, it cannot be said that Congress

acted irrationally in passing the Coal Act. "[W]hether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Usery*, 428 U.S. at 19, 96 S.Ct. at 2894. Unity's Substantive Due Process challenge must be rejected.

### C. Takings Challenge [5]

"The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960) (government's actions resulted in destruction of petitioner's liens for materials that petitioner furnished to a contractor that had been building boats for the United States; government's total destruction of all value in the liens was a taking for which just compensation is due under the Fifth Amendment).

In *Concrete Pipe* and *Connolly*, the Supreme Court considered and rejected Takings challenges to the MPPAA, and clarified the analysis to be applied in challenges to such economic legislation. As explained in *Connolly*, Congress enacted the MPPAA in the aftermath of ERISA in an effort to protect multiemployer pension plans from the "adverse consequences that resulted when individual employers terminate their participation in, or withdraw from," multiemployer plans. *Connolly*, 475 U.S. at 215, 106 S.Ct. at 1021 (quoting *Gray*, 467 U.S. at 722, 104 S.Ct. at 2714).

> As enacted, the [MPPAA] requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal

liability is the employer's proportionate share of the plan's "unfunded vested benefits," calculated as the difference between the present value of vested benefits and the current value of the plan's assets. Pursuant to 29 U.S.C. § 1461(e), these withdrawal liability provisions took effect on April 29, 1980, approximately five months before the statute was enacted into law.

*Gray*, 467 U.S. at 725, 104 S.Ct. at 2715 (citations omitted).[6]

In rejecting the Takings challenge to the MPPAA as applied to the plaintiff in *Concrete Pipe*, the Supreme Court reaffirmed the principle that a "taking" does not occur merely because a statute, as applied, overrides or upsets the claimant's private contractual protections:

> Appellants' claim of an illegal taking gains nothing from the fact that the employer in the present litigation was protected by the terms of its contract from any liability beyond the specified contributions to which it had agreed. "Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." [citations omitted]
>
> If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions.

*Concrete Pipe*, — U.S. at ——, 113 S.Ct. at 2290 (quoting *Connolly*, 475 U.S. at 223–24, 106 S.Ct. at 1025).

---

5. For the reasons set forth in *In re Chateaugay Corp.*, 53 F.3d at 491–94, the Court rejects the government's argument that the Tucker Act, 28 U.S.C. § 1491(a), acts to remove the instant constitutional challenge to the Coal Act from this Court's jurisdiction.

6. In *Gray*, the Court rejected a challenge under the Substantive Due Process Clause to the retroactive application of the MPPAA. In holding that application of the withdrawal liability provisions

of the MPPAA during the 5-month period prior to the statute's enactment did not violate the Due Process Clause of the Fifth Amendment, the Court found that Congress acted rationally in concluding that retroactive application of the statute would "prevent employers from taking advantage of a lengthy legislative process and withdrawing while Congress debated necessary revisions in the statute." 467 U.S. at 731, 104 S.Ct. at 2718.

The Supreme Court has "eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment," and has relied instead "on ad hoc, factual inquiries into the circumstances of each particular case." *Connolly,* 475 U.S. at 224, 106 S.Ct. at 1026. *See also Concrete Pipe,* —— U.S. at ——–——, 113 S.Ct. at 2290–91; *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) ("There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic." (citations omitted)).

The Court has identified three factors which have "particular significance" in conducting the requisite factual inquiry:

(1) the economic impact of the regulation on the claimant;

(2) the extent to which the regulation has interfered with distinct investment-backed expectations; and

(3) the character of the governmental action.

*Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026 (quoting *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). *See also Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2290 ("Following *Connolly,* the next step in our analysis is to subject the operative facts, including the facts of the contractual relationship, to the standards derived from our prior Takings Clause cases.").

### 1. *The Nature of the Governmental Action*

In *Concrete Pipe* and *Connolly,* the Court began its analysis of the MPPAA by considering "the nature of the governmental action." In both cases, the Court drew a sharp distinction between actions by the federal government which involve a physical invasion of property or a complete deprivation of all economic benefit of property, as opposed to those situations in which the government merely regulates economic activity so as to adjust the rights for the public good:

The Government does not physically invade or permanently appropriate any of the employer's assets for its own use. Instead, the Act safeguards the participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan. This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation.

*Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2291 (quoting *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026).

The Court specifically rejected the argument that economic legislation such as the MPPAA should be evaluated pursuant to the analytical framework developed in cases "dealing with permanent physical occupation or destruction of economically beneficial use of real property." *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2290.

While Concrete Pipe tries to shoehorn its claim into this analysis by asserting that "[t]he property of [Concrete Pipe] which is taken, is taken in its entirety," ... we rejected this analysis years ago in *Penn Central,* ... where we held that a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of the parcel in question.

*Id.* (citations omitted). As this statement reveals, however, the Court's view of the nature of the governmental action often "blends" into its analysis of the economic *impact* of the governmental action on the claimant (one of the other factors that must be considered in a Takings analysis).

In *Connolly* (upon which the *Concrete Pipe* Court relied), the Court made the seemingly categorical statement that when the govern-

ment does not "physically invade" or "permanently appropriate any of the employer's assets for its own use," but when it simply adjusts the "benefits and burdens of economic life" in conjunction with a "public program" that promotes the "common good," such actions do not constitute a taking requiring government compensation. 475 U.S. at 225, 106 S.Ct. at 1026. The four cases cited by the *Connolly* Court in support of this sweeping conclusion (*Penn Central Trans. Co.*, 438 U.S. at 124, 98 S.Ct. at 2659; *Turner Elkhorn*, 428 U.S. at 15, 96 S.Ct. at 2892; *Andrus v. Allard*, 444 U.S. at 65, 100 S.Ct. at 326; and *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922)), however, as well as the *Connolly* opinion itself,[7] make clear that there are limits to the reach of the Court's statement.

■ In determining the "nature of the governmental action" (*i.e.*, whether the government "physically invades" or "permanently appropriates", or whether the government merely "adjusts the benefits and burdens of economic life"), the Court in *Connolly* (and in the cases cited in *Connolly*) considered, at least in part, the *effect* of the government's actions on the claimant—which is a factually specific inquiry. The Supreme Court's takings jurisprudence recognizes the principle that even a statute which adjusts the "benefits and burdens of economic life" in conjunction with a "public program" that promotes the "common good," *if it goes too far*, may, in fact, be properly characterized as action by the government in which it "permanently appropriate[s] . . . the employer's assets for its own use". (475 U.S. at 225, 106 S.Ct. at 1026)—a conclusion that more readily supports a finding of an unconstitutional taking.

For example, in Justice Holmes' seminal decision on "regulatory takings," *Pennsylvania Coal Co. v. Mahon*, the Supreme Court addressed the constitutionality of a statute enacted by the Pennsylvania Legislature that

prohibited the mining of anthracite coal in a manner that would cause land subsidence. The following passage in *Mahon* was cited by the *Connolly* Court (475 U.S. at 225, 106 S.Ct. at 1026) in support of its analysis of the "nature of the governmental action":

> As applied to this case the statute is admitted to destroy previously existing rights of property and contract. The question is whether the police power can be stretched so far.
>
> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power.

*Mahon*, 260 U.S. at 413, 43 S.Ct. at 159. Elsewhere in its opinion, in striking down the Pennsylvania statute, the Court emphasized the constitutional limitations placed on governmental action, and again stressed the factually specific nature of the Takings analysis:

> The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. When this seemingly absolute protection is found to be qualified by

---

7. *See Connolly*, 475 U.S. at 224, 106 S.Ct. at 1025 ("[T]he fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking. This is not to say that contractual rights are never property rights or that the Government may always take them for its own benefit without

compensation. But here, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose." (citations omitted)).

the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. It may be doubted how far exceptional cases, like the blowing up of a house to stop a conflagration, go— and if they go beyond the general rule, whether they do not stand as much upon tradition as upon principle. In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders. We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we already have said this is a question of degree—and therefore cannot be disposed of by general propositions.

260 U.S. at 415–16, 43 S.Ct. at 160 (citations omitted).

Similarly, in *Andrus v. Allard,* 444 U.S. at 65–66, 100 S.Ct. at 326–27, the Court affirmed the factually specific nature of the Takings inquiry. The *Andrus* Court considered a Takings challenge with respect to certain federal statutes that banned the sale of avian Indian relics that existed before the species of birds whose parts were used in the relics came under the protection of the federal laws. The following passage was cited by the *Connolly* Court (475 U.S. at 225, 106 S.Ct. at 1026) in support of its analysis of the "nature of the governmental action":

[G]overnment regulation—by definition— involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."

The Takings Clause, therefore, preserves governmental power to regulate, subject only to the dictates of " 'justice and fairness.' " There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic.

The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety. *In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds.*

444 U.S. at 65–66, 100 S.Ct. at 326–27 (citations omitted) (emphasis added). Thus, the *effect* of the federal statutes on the claimant was considered by the *Andrus* Court in analyzing the *nature* of the governmental action.[8]

---

8. As noted above, in its analysis of the "nature of the governmental action", the *Connolly* Court also cited *Penn Central* and *Turner Elkhorn.* The passages from those cases cited by the *Connolly* Court likewise demonstrate the limits of the *Connolly* Court's broad statement. The Court in *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659 merely acknowledged that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (citation omitted). In *Turner Elkhorn,* 428 U.S. at 15, 96 S.Ct. at 2892, the Court was confronted with a *Due Process* challenge to the Black Lung Benefits Act, and stated that "this Court long ago upheld against due process attack the competence of Congress to allocate the interlocking economic rights and duties of employers and employees upon workmen's compensation principles analogous to

In attempting to characterize the "nature of the governmental action" with respect to the MPPAA, the *Concrete Pipe* and *Connolly* Courts spoke of the government adjusting "the benefits and burdens of economic life." 475 U.S. at 225, 106 S.Ct. at 1026. Significantly, in those cases, the Supreme Court was not confronted with a situation in which the "adjustment" of the "burdens of economic life" would result in the certain bankruptcy of the claimant, leaving it without *any* economic viability. Neither *Concrete Pipe, Connolly*, nor the four cases cited in *Connolly*, stand for the radical proposition that any public program adjusting "the benefits and burdens of economic life"—irrespective of the effect on the claimant—will withstand constitutional scrutiny under the Takings Clause.

■ Accordingly, although the Coal Act, at first blush, may be characterized merely as an "interference with the property rights of an employer [arising] from a public program that adjusts the benefits and burdens of economic life to promote the common good" (a conclusion that subjects the government's actions to a less rigorous constitutional scrutiny and lends support to a finding that no "taking" has occurred), the *true* nature of the governmental action can only be evaluated in conjunction with an examination of the severity of the economic effect of the governmental action on the claimant—the second prong of the Supreme Court's Takings analysis.

### 2. *The Economic Impact On Unity*

In evaluating the severity of the economic impact of the governmental action in *Concrete Pipe* and *Connolly*, the Court found three factors significant in support of its finding that no "taking" had occurred by application of the MPPAA: 1) "mere diminution in the value of property" is insufficient to demonstrate a taking (*Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2291); 2) the employer's liability under the MPPAA was not " 'out of proportion to [the employer's] experience' " with the benefits plan (*Id.* (quoting *Connolly,* 475 U.S. at 226, 106 S.Ct. at 1027)); and 3) the MPPAA contained "a significant number of provisions ... that

those enacted here, regardless of contravening

moderate and mitigate the economic impact of an individual employer's liability"—including limiting withdrawal liability for an employer that liquidates its business (*Connolly,* 475 U.S. at 225–26 & n. 8, 106 S.Ct. at 1026 & n. 8).

In *Concrete Pipe,* the petitioner argued that the economic impact of the MPPAA supported a finding of an unconstitutional taking because the petitioner would be required to "pay out 46% of shareholder equity" in order to satisfy its obligations under the Act. —— U.S. at ——, 113 S.Ct. at 2291. In rejecting this contention, the Court cited *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), for the proposition that "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." —— U.S. at ——, 113 S.Ct. at 2291. *Euclid* and *Hadacheck* involved challenges to land use restrictions which resulted in the diminution in value of the claimant's property of 75% and 92.5%, respectively. Significantly, the claimants in *Euclid* and *Hadacheck* retained at least some economic viability in the property at issue.

The impact of the Coal Act on Unity Real Estate stands in marked contrast to the situation in *Concrete Pipe* and *Connolly.* It is undisputed that application of the Coal Act to Unity will result in its liquidation within the first several months of payments under the Act. This factor, while not dispositive, distinguishes the Coal Act's application to Unity from the situations in *Concrete Pipe, Connolly,* and the cases relied upon by the defendant Trustees and by the United States in this action. The other "Coal Act cases" in which courts have ruled upon the constitutionality of the Act also are distinguishable in this respect. *See In re Chateaugay Corp.,* 53 F.3d at 495 ("At its bankruptcy confirmation hearing, LTV's chief financial officer conceded that the Coal Act obligations will not interfere with LTV's ability to emerge from bankruptcy and return to profitability.").

In evaluating this prong of the Takings analysis, however, the Supreme Court in

arrangements between employer and employee."

*Connolly* was less concerned with the magnitude of the economic diminution, and instead focused on the conduct of the claimant in relation to the statute at issue:

> [A]s to the severity of the economic impact of the MPPAA, there is no doubt that the Act completely deprives an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability. The assessment of withdrawal liability is not made in a vacuum, however, but directly depends on the relationship between the employer and the plan to which it had made contributions.... There is nothing to show that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the Act is but a necessary consequence of the MPPAA's regulatory scheme.

*Connolly*, 475 U.S. at 225–26, 106 S.Ct. at 1026–27. Since the withdrawal liability imposed on an employer by the MPPAA " 'is the employer's proportionate share of the plan's "unfunded vested benefits," ' " (*id.*, at 217, 106 S.Ct. at 1022 (citations omitted)), the Court in *Connolly* found that the impact of the MPPAA was not so severe as to support a finding of an unconstitutional taking.

■ Thus, as Magistrate Judge Pesto noted in his initial Report and Recommendation, in analyzing the economic impact of the Coal Act on Unity, the primary consideration is "the economic nexus between the burden and the party burdened by the statute." Docket No. 26, at 838. *See In re Chateaugay Corp.*, 53 F.3d at 494 ("Where a regulation mandates contributions to a benefit fund, the proper yardstick of economic impact is that of proportionality. Our assessment of economic impact 'is not made in a vacuum ... but directly depends on the relationship between the employer and the plan to which it had made contributions.' " (quoting *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026)).

In making this determination with respect to the Coal Act and the specific facts before it, the Second Circuit in *In re Chateaugay* held that LTV Steel, which had exited the coal mining industry in 1986, "has failed to show that its Coal Act liability will be 'out of proportion to its experience' with the 1950 and 1974 Benefit Trusts." 53 F.3d at 494 (quoting *Connolly*, 475 U.S. at 226, 106 S.Ct. at 1027). The court explained:

> LTV's obligation to contribute to the Combined Fund derives from Congress's rational decision to require the entire class of signatory coal mine operators to fulfill their promises of lifetime health benefits for retirees. As a leading member of the BCOA, LTV participated in the collective bargaining that created the 1950 and 1974 Benefit Trusts and in their operation for nearly four decades. Moreover, the employment relationship supplies the rational link by which LTV's Coal Act premiums are tied to its past experience with the benefit plans. As with the other signatory operators, the size of LTV's annual contributions depends entirely on the number of its former employees receiving benefits from the Combined Fund. By thus mooring a given company's funding obligations to a legitimate measure of its prior benefit from the UMWA health care system, the Coal Act rationally apportions future financial responsibility according to past participation. Consequently, we are not confronted with a case of Congress " 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' "

*Id.*, at 494 (citations omitted). The Second Circuit concluded that "LTV's liability under the Coal Act permissibly reflects its experience with the Benefit Trusts and the National Bituminous Coal Wage Agreements." *Id.*

Unlike LTV Steel, however, Unity Real Estate does not have, and never has had, any direct experience (let alone influence) with the Benefit Trusts or the National Bituminous Coal Wage Agreements. Unity was not a "leading member of the BCOA"; in fact, Unity is "once removed" from having any experience at all with the Benefit Trusts or the NBCWAs. Unity's liability under the Coal Act hinges solely on the fact that, pursuant to 26 U.S.C. § 9701(c), it is a "related person" to two coal mining companies (a predecessor of Unity, and a former, bankrupt subsidiary of Unity) that ceased to do any business in the coal industry over ten years

prior to passage of the Coal Act. Both the United States and the defendant Trustees argue that Unity's liability under the Coal Act nonetheless should be found to be "proportional" to Unity's experience with the benefit plans. Such a conclusion, however, goes far beyond the reasoning and holdings of the Supreme Court in *Concrete Pipe* and *Connolly.*

In considering the "proportionality" of the liability imposed by the MPPAA, the Court in *Concrete Pipe* and *Connolly* was confronted with a situation in which the statute applied to employers who were still participating in the multiemployer pension plans when the legislation was enacted, or to employers who had withdrawn from the plans within five months prior to the statute's enactment. The Court, therefore, had no problem making a meaningful comparison between "current liability" and "experience with the plan" in order to determine "proportionality." In other words, an employer could be "tied" to the current liability (or at least a reasonable determination of "proportionality" could be made), because the liability was calculated at the time (or very close to the time) when the employer actually *was in relationship with* the plan at issue.

The Court in *Connolly* and *Concrete Pipe* did not simply acquiesce in a finding of "proportionality" merely because the employer could be identified as a participant, at some undefined time, in the multiemployer pension plan—"[t]he assessment of withdrawal liability is not made in a vacuum ..., but directly depends on the *relationship* between the employer and the plan to which it had made contributions.". *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026 (emphasis added). Given the facts in *Connolly* and *Concrete Pipe,* the Court had little trouble finding that the claimants' liabilities were "proportional" to their experience with the plans. The same cannot be said of the Coal Act's impact on Unity.

As Magistrate Judge Pesto correctly explains in his Amended Report and Recommendation (Docket No. 42, at 847):

It is important to realize that the burden imposed by the Coal Act, to pay for whatever general health benefits the Combined Plan will provide to beneficiaries, has no connection to the past employment of the beneficiaries, even when those beneficiaries themselves were employed by Unity's predecessors. Prior employment merely identifies the class of retirees which is assigned to Unity.

Basically, the United States and the defendant Trustees ask this Court to find that the current liability imposed by the Coal Act on Unity should be considered "proportional" to Unity's experience with the benefit plans merely because the beneficiaries assigned to Unity were at some point (decades ago) employed by Unity's predecessors. In other words, the United States and the defendant Trustees seek to eliminate any quantitative or qualitative component to the "proportionality" analysis. Based on this "reasoning," "proportionality" would be stripped of any meaning, and Unity's liability could be characterized as "proportional" so long as Unity (or its predecessors) had any experience whatsoever with the benefit plans. Such an interpretation of "proportionality" is not supported by the reasoning and holdings of *Connolly* and *Concrete Pipe.*

▪ In the instant case, the Court must attempt to make a true comparison, and determine whether the current liability imposed by the Coal Act is *proportional* with the *experience* of Unity and/or Unity's predecessors with the benefit plans. In making this determination, the Court must take into consideration the following facts: Unity was incorporated in 1947, and in 1969 was the surviving entity after a merger with three inactive coal companies (Stewart Coal & Coke, Penn View Coal, and South Union Coal Company); South Union had operated at various times two coal mines in southwestern Pennsylvania and one in northern West Virginia; from 1961 until 1969, South Union mined no coal; in 1974, Unity incorporated a wholly-owned subsidiary in West Virginia, also named South Union Coal Company, to reopen the mine formerly operated by the Pennsylvania-incorporated South Union; South Union (West Virginia) operated the mine in West Virginia formerly operated by South Union (Pennsylvania) from 1974 until 1981, when it went bankrupt; South Union

(Pennsylvania) had been a member of the West Virginia Coal Association, which was a signatory to the 1950, 1951, 1952, 1955, 1956, and 1959 National Bituminous Coal Wage Agreements through its membership in the BCOA; South Union (West Virginia) was a member of the Western Pennsylvania Coal Operators Association, a member of the BCOA, and thereby a signatory of the 1974, 1978, and 1981 NBCWAs; when South Union (West Virginia) went into bankruptcy in 1981, it petitioned for leave and was granted leave by the bankruptcy court to reject its obligations under the 1981 NBCWA; neither Unity nor its predecessors have had any relationship with the benefit plans for over a decade.

Given Unity's (and its predecessors') long-terminated relationship with the benefit plans, the current liabilities imposed by the Coal Act are not "proportional" in any meaningful sense. Although Unity's predecessors participated in the funding of the multiemployer plans, the liabilities incurred by Unity's predecessors, as well as the benefits received from this participation (*i.e.*, the availability of a labor pool, economies of scale, etc.), were completely realized decades ago. There is no "connection" between the current liabilities and the past experience of Unity's predecessors. The task before the Court in this case is much like comparing apples and oranges—South Union (Pennsylvania) ceased mining coal in 1961, yet the Coal Act seeks to impose tens of thousands of dollars in liability on Unity in 1993—based, in large part, on the simple fact that the assigned beneficiaries were employed at some time by South Union (Pennsylvania).

The United States and the defendant Trustees confuse and "blend" the issues in arguing that "proportionality" should be found based upon the *retirees'* expectations of lifetime benefits. They argue:

Congress, in assigning responsibility for coal miner retiree health benefits to past and present signatories, selected a rational approach to resolving the financial crisis of the UMWA Benefit Trusts.... Congress reasonably required that NBCWA signatory operators, as opposed to the public at large or the entire coal industry, propor-tionally share in the cost of ensuring that UMWA retirees·continue to receive health benefits: NBCWA signatories, like South Union Coal Company, and not the taxpayers, were responsible for the creation of the obligations to these beneficiaries. Likewise, the assigned operators, not the coal industry generally, were most responsible for the payment of the premiums for the health care benefits of the individual retired miners assigned to them.

Docket No. 30, at 31–32. This argument *assumes,* rather than proves, proportionality. In addition, the argument that Congress acted rationally in passing the Coal Act—which is a proper consideration with respect to a Substantive Due Process analysis—adds little to the Takings inquiry.

Magistrate Judge Pesto correctly disposes of the United States' argument that Unity's liability under the Coal Act should be considered "proportional" because of the retirees' expectation of lifetime health benefits. *See* Amended Report and Recommendation (Docket No. 42), at 847–848. The argument, in large part, is based on the erroneous assumption that Unity (or its predecessors) created, or were ultimately responsible for, the retirees' expectation of lifetime health benefits.

To the contrary, the prior employment relationship did not create any legitimate expectation of lifetime benefits *from Unity (or its predecessors)* once Unity's predecessors left the coal industry. "A significant reason for the Coal Act is precisely this failure of the trustees of the former benefit plans to establish that proposition judicially, while the benefit plans were faced with judicial decisions holding that retirees had an expectation of lifetime benefits from them." Amended Report and Recommendation (Docket No. 42), at 847.

At most, the evergreen clauses in the 1978 and 1980 NBCWAs imposed a continuing (not perpetual) obligation to contribute to the plans if a signatory dropped out of the BCOA *but* continued to mine coal under an agreement with the UMWA without being bound by a current NBCWA. *See UMWA 1974 Pension v. Pittston Co.,* 984 F.2d 469 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113

S.Ct. 3040, 125 L.Ed.2d 726 (1993). The evergreen clauses are not binding on an employer like Unity that left the coal business— the duty to contribute under the clauses is based on tons of coal mined or hours worked in mining operations.[9]

Admittedly, the retirees' expectation of lifetime health benefits may be one factor to consider in evaluating the coal industry and Unity's involvement therein. Given Unity's limited "connection" with this expectation, however, it should not be considered dispositive in determining whether the current liabilities imposed by the Coal Act are proportional to Unity's experience with the benefit plans.

The inquiry involves a quantitative and qualitative examination of *Unity's involvement with the benefits plans*—not an examination of whether a current crisis exists in the coal industry, or whether retirees in the coal industry developed an expectation of lifetime health benefits as a result of any reason whatsoever, or whether Congress has the authority to upset contractual expectations. As explained above, Unity's (and its predecessors') involvement with the benefits plans ended years ago. *See* Docket No. 39, at 10 ("[W]hen Unity's last collective bargaining agreement was rejected by the Bankruptcy Court in 1981, Unity permanently ceased contributing to, having any contractual or legal relationship with, or receiving any benefit whatsoever from the subject plans."). The current liabilities imposed by the Coal Act are so enormous that they cannot properly be characterized as "proportional" to Unity's experience with the plans.

Finally, in analyzing the economic impact of the Coal Act, the Second Circuit in *In re Chateaugay Corp.* found it significant that the Act contains certain provisions that allegedly "moderate and mitigate" the burdens imposed:

> We note that while the assigned operators may eventually have to bear some of the costs of providing benefits to the industry's "orphaned" retirees, the Coal Act contains several provisions mitigating that burden.

First, the transfer of $210 million from the 1950 Pension Fund in the Combined Fund's first three fiscal years will eliminate the unassigned beneficiary and death benefit premiums for all assigned operators in at least the first two of those years. The second series of transfers from the Abandoned Mine Reclamation Fund will continue until at least 2004, potentially totalling hundreds of millions of dollars. By thus minimizing LTV's financial responsibility for retirees it never employed, the ·Coal Act reinforces the .centrality of the employment relationship to the imposition of liability.

53 F.3d at 494–95. Since Unity is incapable of complying with its obligations for beneficiaries *already* assigned (*i.e.*, Unity faces certain bankruptcy within a very short time), Unity can take little solace in the fact that the Coal Act contains provisions which "mitigate and moderate" Unity's possible future obligations for retirees that its predecessors never employed. This consideration does not weigh in favor of the Act's constitutionality, at least as applied to Unity.

Although the Coal Act may have been intended by Congress to merely "adjust[ ] the benefits and burdens of economic life to promote the common good" (*Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026), the nature of the governmental action must be determined in conjunction with the *effect* of the Act on the claimant here—the bankruptcy of Unity, a small corporation whose business involves leasing a small building and parking lot, and who is classified under the Coal Act as a "related person" to a predecessor corporation and a former (bankrupt) subsidiary that left the coal industry years ago. Thus, the true "nature of the governmental action" here is more properly characterized as "permanently appropriat[ing] . . . the employer's assets for [the government's] own use." 475 U.S. at 225, 106 S.Ct. at 1026. The first and second prongs of the Supreme Court's Takings analysis support a finding that the Coal Act, as applied to Unity, is unconstitutional.

---

**9.** In any event, the great majority of beneficiaries assigned to Unity ended their service before 1978 (the year that Unity first signed a NBCWA containing an evergreen clause). *See* Declaration of Kyu W. Lee (Docket No. 33), setting forth summaries of service histories.

3. *The Extent to Which the Coal Act has Interfered With Unity's Investment-backed Expectations.*

"The final factor [for consideration in the Takings analysis] is the degree of interference with [the claimant's] 'reasonable investment-backed expectations.'" *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2291 (quoting *Connolly,* 475 U.S. at 226, 106 S.Ct. at 1027). The *Connolly* Court explained that the withdrawal liability imposed by the MPPAA did not interfere with reasonable expectations because the employers had been given "sufficient notice" of the potential liability for withdrawing from multiemployer pension plans. 475 U.S. at 227, 106 S.Ct. at 1027. Pension plans "were the objects of legislative concern long before the passage of ERISA in 1974"; it was clear as of the time of ERISA's passage that employers faced at least potential liability for withdrawing from a multiemployer plan; and by the time that Congress passed the MPPAA in 1981, "[p]rudent employers ... had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations." *Id.,* at 226–27, 106 S.Ct. at 1027. "'Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'" *Id.* at 227, 106 S.Ct. at 1027 (quoting *FHA v. The Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958)). *See also Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2292 ("Concrete Pipe's reliance on ERISA's original limitation of contingent liability to 30% of net worth is misplaced, there being no reasonable basis to expect that the legislative ceiling would never be lifted." (footnotes omitted)).

Based on the reasoning of *Concrete Pipe* and *Connolly,* the United States and the defendant Trustees argue that the Coal Act does not interfere with Unity's reasonable investment-backed expectations—"[G]iven the extensive governmental involvement in and regulation of the coal industry over the years, and of the benefits field generally, one could reasonably foresee that the government might take action at some point to ensure that the Benefit Trust would remain solvent and capable of meeting its obligation." *See* Docket No. 30, at 41 (quoting *In re Chateaugay,* 163 B.R. 955, 961 (S.D.N.Y.1993)).

Knowledge of the possibility that Congress, at some point, might institute some corrective measure for the funding of coal retirees' benefits, however, differs dramatically from reasonably foreseeing that Congress *might impose liability on Unity in the unprecedented manner as that set forth in the Coal Act.* The United States' and defendant Trustees' argument ignores the critical distinctions between the limited retroactive reach of the MPPAA and the more substantial impact of the Coal Act on a corporation such as Unity. In addition, as Magistrate Judge Pesto explained, the argument simply proves too much:

> The possibility that the BCOA and UMWA might someday alter the contribution formula [for funding the benefits plans] after Unity's predecessors left the coal industry naturally would be a matter of complete disinterest to Unity, given that no judicial decision, regulation, or statute prior to the Coal Act made Unity's predecessors liable for continuing contributions to the coal industry's plans. And if the possibility of a decade-later legislative solution to a crisis makes the imposition of liability on Unity on some basis chosen by Congress constitutionally foreseeable, then the expectations prong of Takings Clause analysis ceases to exist, because legislation can always be foreseen.

Amended Report and Recommendation (Docket No. 42), at 848–849. The district court in *In re Blue Diamond* summarized the Coal Act's drastic interference with the investment-backed expectations for claimants such as Unity:

> The Secretary suggests that it was unreasonable for Blue Diamond to believe that its 1964 National Bituminous Coal Wage Agreement would forever limit its responsibility to the UMWA benefit trusts. Maintaining economic stability in the coal industry has long been a matter of federal concern. Blue Diamond should not be surprised that Congress acted in 1992 to avert

the crisis in the 1950 and 1974 Benefit Trusts which threatened to disrupt coal production and deprive UMWA retired miners of their long-expected lifetime health benefits. The Court agrees that it was reasonably foreseeable that Congress would take action to ensure that the UMWA benefit trust would remain solvent and capable of meeting its obligations. *But it was a good deal less foreseeable that the legislation chosen to solve the problem would reach back to conduct which occurred almost 30 years ago in order to enforce a "promise" Blue Diamond never actually made.* The best that can be said for the Secretary's argument is that Blue Diamond had to have known that its own retirees were among the many "orphans" drawing benefits from the UMWA trusts and contributing to their financial instability. The second factor [in the Takings analysis] also favors Blue Diamond, but less emphatically [than the first (the severe economic impact)].

174 B.R. at 728 (emphasis added).[10] *See also Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2293 (O'Connor, J., concurring) ("I also note that the Court's opinion should not be read to imply that employers may be subjected to retroactive withdrawal liability simply because 'pension plans [have] long been subject to federal regulation.' Surely the employer that joined a multiemployer plan before ERISA had been promulgated—before Congress had made employers liable for unfunded benefits—might have a strong constitutional challenge to retroactive withdrawal liability. The issue is not presented here—again, petitioner joined the Construction Laborers Pension Trust after the passage of ERISA—and the Court does not address it. It remains to be resolved in a future case." (citation omitted)).

### V. *Conclusion*

■ "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Mahon,* 260 U.S. at 416, 43 S.Ct. at 160. The Coal Act, as applied to Unity, goes far beyond the type of legislation upheld by the Supreme Court in *Connolly* and *Concrete Pipe.* An evaluation of the facts of this case, pursuant to the criteria set forth in the Supreme Court's Takings jurisprudence, leads to the conclusion that the Coal Act, as applied to Unity, effects an uncompensated "taking" in violation of the Fifth Amendment.

An appropriate Order follows.

### ORDER

AND NOW, this 7th day of June, 1995, consistent with the foregoing Opinion, plaintiff Unity Real Estate Co.'s motion for a preliminary injunction (Docket No. 4) is hereby GRANTED. This Court finds that the Coal Industry Retiree Health Benefit Act of 1992, Pub.L. 102–486, 106 Stat. 2776, 3036–56 (codified at 26 U.S.C. §§ 9701–9722) (the "Coal Act"), as applied to Unity, effects an uncompensated "taking" in violation of the Fifth Amendment.

Unity has demonstrated a reasonable likelihood of success on the merits, and Unity will suffer irreparable harm in the absence of a preliminary injunction.

Accordingly, it is hereby ORDERED that the defendant Trustees are hereby restrained from enforcing the Coal Act against Unity in any respect pending a final disposition on the merits.

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, plaintiff Unity Real Estate shall post security in the amount of $5000.

### *Report and Recommendation*

PESTO, United States Magistrate Judge.

Pending before the Court is plaintiff Unity Real Estate Company's motion for a prelimi-

---

**10.** Although the *Blue Diamond* court upheld the constitutionality of the Coal Act, it acknowledged: "This Court has no more idea than the *Templeton* court where the line should be drawn in constitutional challenges to economic legislation. If the super-reachback provision of the Coal Act does not cross the line, it must step right up to it." 174 B.R. at 729. The *Blue Diamond* court nevertheless concluded that the coal Act was "a rational legislative response to a crisis in coal retiree health benefits." *Id.*

nary injunction restraining the enforcement of the Coal Industry Retiree Health Benefit Act of 1992, Pub.L. 102–486, 106 Stat. 3036–56, 26 U.S.C. § 9701 *et seq.*, by the defendants, the Boards of Trustees of the UMWA Combined Benefit Fund and the 1992 UMWA Benefit Plan.[1] The matter was referred to me pursuant to the Magistrates Act, 28 U.S.C. § 636(b)(1), and subsections 3 and 4 of Local Rule 72.1 for Magistrate Judges. I recommend that an injunction issue.

In order to obtain a preliminary injunction, Unity must show a likelihood of success on the merits and a probability that irreparable harm will occur if the injunction is not granted. I must also consider the effect of the injunction on other interested persons, and the public interest. *See Bradley v. Pittsburgh Board of Education,* 910 F.2d 1172, 1175 (3d Cir.1990).

*Probability of irreparable harm*

Ordinarily, financial injury does not constitute irreparable harm as matter of law. It is not so much that money cannot be the subject of an injunction as that injuries that can be remedied by an award of damages do not warrant injunctive relief. *See In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1145 (3d Cir.1982). Where the evidence shows the probability that the movant will suffer bankruptcy as a result of the challenged conduct, however, injunctive relief may be necessary to prevent irreparable harm. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975).

*The public interest and effect on third parties*

These factors weigh neither in favor of or against issuance of an injunction. There is no evidence that the public at large or those third parties who are most directly affected by the Coal Act, the "orphan" retirees, liability for whom has have been assigned to Unity, will be affected adversely by the grant of preliminary injunctive relief.

*Likelihood of success on the merits*

Unity challenges the constitutionality of a statute regulating economic activity in an area committed to Congress by the Commerce Clause. Legislation such as the Coal Act therefore carries a strong presumption of constitutionality, and as the Supreme Court has repeatedly stated, must be upheld unless it is shown to be either contrary to a restraint placed on government by the Constitution or arbitrary and irrational, that is, not a rational means of furthering a legitimate legislative purpose. *United States v. Carlton,* —— U.S. ——, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994). Four district courts that have considered challenges to the Coal Act have found in favor of its constitutionality, although not without reservations. *See Blue Diamond Coal Co. v. Shalala,* 174 B.R. 722 (E.D.Tenn.1994); *LTV Steel Co. v. Shalala,* 163 B.R. 955 (S.D.N.Y.1993); *Templeton Coal Co. v. Shalala,* 855 F.Supp. 990 (S.D.Ind.1993); *Barrick Gold Exploration, Inc. v. Hudson,* 823 F.Supp. 1395 (S.D.Ohio 1993). Finally, the Supreme Court has not held an act of Congress which regulates the economic affairs of nongovernmental entities unconstitutional since the New Deal. Notwithstanding all this, the Coal Act as applied to Unity is so palpably unconstitutional that a preliminary injunction should issue against the enforcement of the Act against it.

*Facts*

Based on the evidentiary hearing in this matter, the following facts are taken as proved for purposes of the plaintiff's motion:

Unity is a corporation owned by members of the Jamison family which owns a small commercial building and parking lot in Greensburg, Pennsylvania. Unity employs two individuals, an officer at a salary of $7,200 per year, and a janitor. Its annual gross revenues are approximately $50,000 and its net worth is approximately $85,000.

Unity was incorporated in 1947, and in 1969 was the surviving entity after a merger with three inactive coal companies, Stewart Coal & Coke, Penn View Coal, and South

---

**1.** Because Unity's challenge to the operation of the Coal Act is based on a claim that the Act is unconstitutional, the government has also intervened in support of the constitutionality of the Act.

Union Coal Company. Like Unity, South Union was a Jamison family-owned company, which had incorporated in Pennsylvania in 1922. From 1922 through 1960 South Union had operated at various times two coal mines in southwestern Pennsylvania and one in northern West Virginia. From 1961 until 1969, South Union mined no coal. In 1974, Unity incorporated a wholly owned subsidiary in West Virginia, also named South Union Coal Company, to reopen the mine formerly operated by the Pennsylvania incorporated South Union. South Union (West Virginia) operated the mine in West Virginia formerly operated by South Union (Pennsylvania) from 1974 until 1981, when it went bankrupt. South Union (Pennsylvania) was a member of the Northern West Virginia Coal Association which was a signatory to the 1950, 1951, 1952, 1955, 1956, and 1959 National Bituminous Coal Wage Agreements through its membership in the Bituminous Coal Operators Association. South Union (West Virginia) was a member of the Western Pennsylvania Coal Operators Association, a member of the BCOA, and thereby a signatory of the 1974, 1978, and 1981 NBCWAs. When South Union (West Virginia) went into bankruptcy in 1981, it petitioned for leave and was granted leave by the bankruptcy court to reject its obligations under the 1981 NBCWA.

In October 1993, Unity received a letter from the defendant Trustees of the Combined Fund informing Unity that it had been assigned 78 beneficiaries under the Coal Act for which it was obligated to pay a premium of $96,158.84 for the first partial year of operation of the Combined Fund, from February 1, 1993 to October 1, 1993. Unity was advised that for the second year, from October 1, 1993 to September 30, 1994, it was assigned 76 beneficiaries at a premium of $170,681.08. Payment of the premiums was to be made in monthly installments; failure to pay premiums on a timely basis subjects Unity to fines of up to $100/day per beneficiary. Unity does not have the cash on hand to pay even the first month's premium, and its net worth is less than its first year obligation. Unity was assigned beneficiaries on

the basis that the beneficiaries, or their deceased parents or spouses in the case of survivor beneficiaries, had last worked for South Union (Pennsylvania) or South Union (West Virginia) pursuant to a NBCWA. Unity had no records of former employees of South Union (Pennsylvania), having turned those over to the trustees of the UMWA 1950 Welfare and Retirement Fund after it left the coal business in 1961. Unity did have some records of former employees of South Union (West Virginia), but Mr. Jamison, the president of Unity since 1962, who was personally involved in the mining operations of both South Union companies, could recognize only about eight beneficiaries as former employees.

*The Coal Act*

The political and social history which led to the passage of the Coal Act are ably described in the Coal Commission Report (November 1990), docket no. 10, Exhibit A, *Blue Diamond Coal Co., Barrick Gold Exploration, Templeton Coal Co.,* and *LTV Steel Co.,* which, together with the opinion of now Chief Judge Ziegler in *United Mine Workers Int'l Union v. Nobel,* 720 F.Supp. 1169 (W.D.Pa. 1989), *aff'd w/o op.,* 902 F.2d 1558, *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991), provide a background to the legal issues in the instant matter. Congress passed the Coal Act to spread the costs of UMWA benefit plans established and funded by the NBCWAs since 1950. Congress did this by imposing liability for the lifetime health (and other) benefits promised in the NBCWAs to members of the UMWA on entities that had previously signed NBCWAs but which were no longer currently operating under a NBCWA.

*Due Process Clause*

The Due Process Clause challenge to the substantive validity of the Coal Act is without merit. Congress' purpose in enacting the Coal Act, to shore up the benefits plans to UMWA miners, was neither illegitimate nor arbitrary. The means chosen, whether one characterizes it as the imposition of liability for past acts,[2] as plaintiffs do, or the imposi-

---

**2.** The legislative imposition of liability based on the happening of events or the taking of actions

prior to the passage of legislation, which is sometimes loosely described as retroactive legislation,

tion of a tax on the coal industry, as defendants do, is a rational means of achieving that end.

Because the substantive component of the Due Process Clause thus guarantees nothing but this slightest of checks on federal legislation affecting economic activity, no further analysis is required. *See also United States v. Carlton,* —— U.S. at ——, 114 S.Ct. at 2026–27, 129 L.Ed.2d at 34–35 (Scalia, J., concurring in the judgment, stating that the Due Process Clause guarantees *no* substantive rights).

*Takings Clause*

The Takings Clause[3] states that private property shall not "be taken for public use, without just compensation." *See Dolan v. City of Tigard,* —— U.S. ——, —— – ——, 114 S.Ct. 2309, 2315–16, 129 L.Ed.2d 304, 315 (1994). The Coal Act by its terms benefits only those coal miners and their beneficiaries who have been held to be already entitled to lifetime benefits under the NBCWAs. The UMWA and current members of the BCOA are therefore the real beneficiaries of the Coal Act, since the cost of benefits to the benefit plans established by the UMWA and BCOA is transferred in part to entities like Unity that have long since ceased to have any contractual obligation under or receive any contractual benefit from a NBCWA. That Congress has legislated for the benefit of a favored few is no constitutional infirmity, since *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), essentially renders the question of what is a public use a nonjusticiable political question.

What is constitutionally significant is the manner in which burdens are assigned, because a principal purpose of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Dolan v. City of Tigard,* —— U.S. at ——, 114 S.Ct. at 2316, 129 L.Ed.2d at 316, *quoting Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Determining whether a particular statutory scheme results in a taking depends on an *ad hoc* assessment of (1) the economic impact of the statute on the burdened party; (2) the extent of the statute's interference with distinct investment-backed expectations; and (3) the character of the governmental action. *See Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986).

*Economic Impact*

The *Blue Diamond* court analyzed the economic impact factor in terms of the gross effect of the Coal Act on the company's balance sheet. As seen from the factual recitation in this case, Unity Real Estate will be utterly liquidated within the first several months of payments under the Act. That is not dispositive, however, since *Connolly* counsels an examination of the "relationship between the employer and the plan to which it had made contributions," *i.e.,* an examination of the economic nexus between the burden and the party burdened by the statute. 475 U.S. at 225–26, 106 S.Ct. at 1026.[4] Even this finer analysis weighs against the Coal Act, however, since liability is being imposed on Unity (without the benefit of any prede-

has long been upheld under the Due Process Clause. *United States v. Carlton; Usery v. Turner Elkhorn Mining Co.*

**3.** Since takings cases typically involve individual government actions and typically affect real estate or chattel, while substantive due process is the rubric often used to analyze general statutory schemes, particularly prior to the later 1980's, many of the cases setting forth the constitutional analysis used to decide whether a governmental action is a violation of substantive due process are applicable to the discussion of takings.

**4.** In *LTV Steel,* the court found it significant that the Coal Act provides for the reduction of the premiums assigned to former employers such as Unity by transferring assets of the 1950 Benefit Trust Fund and the Abandoned Mine Reclamation Fund to the Combined Fund, citing *Connolly,* 475 U.S. at 225–26, 106 S.Ct. at 1026. Unlike the MPPAA mitigation provisions listed in *Connolly, see* 475 U.S. at 226 n. 8, 106 S.Ct. at 1026 n. 8, under the Coal Act liability is imposed on assigned operators such as Unity despite any action they take, and even despite the absence of threat to the solvency of the Combined Fund. The Coal Act's provision for transfer of assets to the Combined Fund merely reduced a hypothetical unpayable figure to an actual unpayable figure.

privation process) for as little as an allegation of one day's employment of an employee covered by the Act, even if that employment took place, and the company ceased to do any business in the coal industry, more than ten years before the Coal Act.

*Character of the government action*

Whatever the congressional motive in spreading liability from the sector of the mining industry already best able to protect itself—the UMWA and the current members of the BCOA—to a small unsophisticated former coal operator like Unity, the legislation itself is a social welfare measure within Congress' responsibility for interstate commerce and receives the strongest presumption of constitutionality.

*Effect on investment-backed expectations*

The best analysis of this factor was provided by Judge Hull in *Blue Diamond:*

[I]t was reasonably foreseeable that Congress would take action to ensure that the UMWA benefit trust would remain solvent.... But it was a good deal less foreseeable that the legislation chosen to solve the problem would reach back to conduct which occurred almost 30 years ago to enforce a "promise" Blue Diamond never actually made. 174 B.R. at 728.

The argument in favor of the Coal Act is roughly this: those operators who withdrew from the unionized coal industry before the NBCWAs were interpreted in cases such as *UMWA v. Nobel* and *UMWA 1974 Pension v. Pittston Co.,* 984 F.2d 469 (D.C.Cir.1993) to impose perpetual obligations to contribute to the 1950 Pension Plan and the 1974 Pension Plan did not incur the same costs as the coal industry currently does. This disparity results from the incorporation (by judicial decisions) into the cost of doing business of the externality of the social cost of health benefits to miners and their beneficiaries. The Coal Act merely extends that incorporation of externalities to operators who left the industry.

The foregoing analysis is completely within the constitutional mainstream when applied to externalities actually generated by the nature of the coal industry itself, or even to conditions rationally related to the coal industry. The classic example is *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16–17, 96 S.Ct. 2882, 2892–93, 49 L.Ed.2d 752 (1976), where the imposition of liability for black lung disease on coal operators even though they had long since left the industry was held to be constitutional. At the opposite pole is the pension plan held unconstitutional in *Railroad Retirement Board v. Alton R. Co.,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), because it imposed responsibility for a pension for former railroad employees on employers solely on the basis that they happened to be in the same industry. The continuing vitality of *Railroad Retirement Board* has been questioned, *see Templeton Coal Co.,* 855 F.Supp. at 1001, and it is clear that the Supreme Court has become much more deferential in tone and in result to congressional legislation since that decision. Nonetheless, *Turner Elkhorn Mining Co.* itself relied on the fact that imposing liability for black lung disease satisfied a "specific need created by the dangerous conditions under which the former employee labored," 428 U.S. at 19, 96 S.Ct. at 2894, and did "not simply [ ] increase or supplement a former employee's salary." *Id.* At least one member of the Supreme Court expressly continues to "leave open the possibility that the imposition of retroactive liability on employers for the benefit of employees may be arbitrary and irrational in the absence of any connection between the employer's conduct and some detriment to the employee." *Connolly* 475 U.S. at 229, 106 S.Ct. at 1028 (concurring opinion of O'Connor, J.).

The opinion of the Court in *Carlton* on the constitutionality of a retroactive tax increase also indicates some continuing limitation on the scope of Congress' powers. The retrospective elimination of a lucrative tax deduction was upheld by the Court on the basis that it was corrective legislation amending an existing tax, "*and its period of retroactive effect is limited*" —— U.S. at ——, 114 S.Ct. at 2024, 129 L.Ed.2d at 31, to the year prior to the year of the enactment of the statute. *See also id.* at ——, 114 S.Ct. at 2026, 129 L.Ed.2d at 33 ("A period of retroactivity longer than the year preceding the legislative session in which the law was enacted would

raise, in my view, serious constitutional questions.") (opinion of O'Connor, J., concurring in the judgment). *Dolan v. City of Tigard* also sheds some light on the degree of connection required between the assignment of burdens and externalities. Applying the Takings Clause to a municipal attempt to require dedication of a floodplain easement and bicycle path as a condition of expanding a store, the Court held that there must be a "rough proportionality" between the required dedication and the proposed expansion if the municipal action were not to constitute a taking. —— U.S. at ——, 114 S.Ct. at 2319–20, 129 L.Ed.2d at 320. *See also Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026 ("The assessment of liability . . . directly depends on the relationship between the employer and the plan. . . .")

The Coal Act, as applied to Unity Real Estate, is far closer to the general and unconnected imposition of liability questioned in *Connolly* by Justice O'Connor and condemned by both the conservative and liberal justices in *Railroad Retirement Board* than to the imposition of either limited employment-connected liability upheld in *Turner Elkhorn Mining Co.* or to the temporally limited retroactive increases in tax liability upheld in *Carlton*, and in pension liability upheld in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) and *Connolly*. The Coal Act's imposition of liability for general health benefits for miners and their beneficiaries, although it undoubtedly is a good thing that retired miners and their beneficiaries have such benefits, lacks any employment connectedness, and is practically unlimited in time. It is obvious that there can be no "rough proportionality" between the burdens it assigns to Unity and the benefit that Unity receives from the employment relationship. As applied to Unity Real Es-

5. It is therefore not necessary to address the procedural due process attacks on the Coal Act. If it were, I would recommend against the issuance of a preliminary injunction on the basis of a lack of due process on this record.

1. Because none of the evidence submitted by the plaintiff would change the analysis of the substantive due process claim, I do not address further the plaintiff's objections.

tate Co., it effects an uncompensated taking, and is therefore unconstitutional.[5]

Pursuant to 28 U.S.C. § 636(b)(1), the parties are given notice that they have ten days to serve and file written objections to this Report and Recommendation.

DATE: 7 December 1994

### *Report and Recommendation*

PESTO, United States Magistrate Judge.

I filed a Report and Recommendation recommending that plaintiff Unity Real Estate Company's motion for a preliminary injunction restraining the enforcement of the Coal Industry Retiree Health Benefit Act of 1992, Pub.L. 102–486, 106 Stat. 3036–56, 26 U.S.C. § 9701 *et seq.*, by the defendants, the Boards of Trustees of the UMWA Combined Benefit Fund and the 1992 UMWA Benefit Plan, be granted. The legal basis of my recommendation was the conclusion that the Coal Act violates the Takings Clause of the constitution, and I made factual findings that the application of the Coal Act would, if not restrained pending final judgment in this matter, bankrupt the plaintiff without any benefit to the defendants or to the general public.

All parties objected to the Report and Recommendation. The United States, previously silent, objected to my Takings Clause analysis. The defendants also objected to my Takings Clause analysis, and further asserted that I had not made a finding of irreparable harm, but that if I had I had erred in so doing. The plaintiff objected to my conclusion that the Coal Act did not violate the so-called substantive component of the Due Process Clause.[1] With the exception of the defendants' contention that I had made no irreparable harm finding, and *a fortiori* no correct one[2], no party attacked

2. The United States, by contrast, recognized that I had made a finding of irreparable injury but argued that it was incorrect because it was "financial injury alone," United States' Objections at 2, and also contrary to my observation that in analyzing the Takings Clause challenge, financial hardship was not dispositive. Id. The United States does not discuss either objection in its brief, but both are specious. As discussed in the original Report and Recommendation, the fact

my factual analysis [3]. All of the objecting parties, however, filed supplemental evidentiary material reflecting the history of their efforts in this matter since the date of the evidentiary hearing which formed the record before me.

Because the voluminous addition lately made to the factual record [4] substantially outbulks the evidence the parties had, prior to the Report and Recommendation, been content to have the decision rest upon, I am issuing an amended Report and Recommendation which considers the record as the parties now choose to frame it, and which discusses the objections to the Takings Clause analysis in the original Report and Recommendation. I adhere to my original recommendation that "the Coal Act as applied to Unity is so palpably unconstitutional that a preliminary injunction should issue against the enforcement of the Act against it."

### The Original Report

Initially, it is necessary to restate briefly my original Report and Recommendation, since there seems to be either a misunderstanding or a misconstruction of the Report and Recommendation on the part of the objecting parties. I found that plaintiff Unity Real Estate Company was a small family-owned business that was the corporate successor to Stewart Coal & Coke, Penn View Coal, South Union (West Virginia), and South Union (Pennsylvania), which had been in the business of mining coal between 1922 and 1981. It had been assigned to pay health insurance premiums for 78 beneficiaries in 1993 and 76 beneficiaries in 1994 under the Coal Act on the basis of the beneficiaries' (or a beneficiary's spouse or parent's) prior employment by South Union (West Virginia) or South Union (Pennsylvania). Unity Real Estate did not have the cash on hand to pay even the first month's premiums and its net worth is less than its first year obligation. As I stated originally "... Unity Real Estate will be utterly liquidated within the first several months of payments under the Act." Application of the Coal Act to plaintiff would result in its bankruptcy, an irreparable harm, while there was no evidence that a preliminary injunction against the enforcement of the statute against the plaintiff would harm the statutory beneficiaries.

### The objections

Obviously the conclusion as to the constitutionality of the Coal Act under the Takings Clause will ultimately turn on whether the Court concludes that the statute, in the words of Justice Holmes, "goes too far." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Given the fact-bound, *ad hoc* jurisprudence by the Supreme Court in this area there is ample room to disagree over the legal effect of the Takings Clause without distorting the Report and Recommendation's meaning.

Both the United States and the defendants' objections quibble over the Report and Recommendation's use of the terms "orphan" retirees and "employment connectedness", in what appear to be deliberate misconstructions of their meaning. As to "orphan" retirees, I used the term in the precise manner that the Coal Commission Report does, i.e., to refer to retirees whose last employer in the coal industry has gone out of the coal business or is no longer a NBCWA signato-

---

that bankruptcy may result from the Coal Act does not itself make Unity's Takings Clause challenge meritorious. This is in no way contrary to the finding that bankruptcy would satisfy the irreparable harm requirement for injunctive relief. The more general objection that Unity has not demonstrated irreparable injury because it will suffer financial injury alone would prove too much. Since Unity is, like any other corporation, an artificial entity, the only kind of injury it can suffer is financial. The United States' argument on this point, if accepted, would mean no corporation could ever obtain a preliminary injunction.

**3.** And no party objected to my conclusion that the procedural due process challenge to the Coal Act would not support the issuance of a preliminary injunction. The United States, in its Objections at 3, 5, defends the accuracy of the assignment of beneficiaries to Unity under the Coal Act, even though the procedural due process portion of plaintiff's challenge was rejected in the Report and Recommendation and plaintiff did not object thereto.

**4.** For instance, the parties now appear to agree that Unity is the statutory successor to two additional coal producers, Jamison Coal Company and Moremet Coal Company.

ry. *See e.g.* Coal Commission Report at 42. The objectors sometimes understand this meaning, *see e.g.* United States' Brief in Support of Objections at 8, 11–12, and sometimes assert that the term "orphan" refers only to those miners all of whose employers in the coal industry have been dissolved or are impossible to locate, *see* United States' Objections at 2–3; United States' Brief in Support of Objections at 3; Defendants' Objection at 12, 19. Objectors do so in an attempt to create a straw man. Recognizing that the constitutionality of statutory assignment of what the Coal Commission would call "orphaned" beneficiaries, i.e. beneficiaries who had once worked for Unity's predecessors, all of which have left the coal industry, is a comparatively easier question than the assignment of what may be called "truly orphaned" beneficiaries, i.e. unassigned beneficiaries who never worked at any time for Unity's predecessors [5], defendants contend that the Report and Recommendation errs because it analyzed the constitutionality of assignment of the latter class of beneficiaries even though no "truly orphaned" miners had been (or will be, according to defendants) assigned to Unity. Defendants' Objection at 31. The objection falsely implies that the retirees assigned to Unity were defined in the original Report and Recommendation as "miners having no employment relationship with any assigned operator," *id.*, the direct opposite of what the Report and Recommendation stated, *see* Report and Recommendation at 837.

The term "employment *connectedness*" has a meaning which I thought was obvious from context, namely that the burden imposed by the Coal Act cannot be derived from either the contractual relationship between former coal employer and union employee, or any recognized species of tort liability for conditions generated by the coal industry, such as that upheld in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), or imposed by CERCLA. The objection that the Report and Recommendation "emphasizes the idea that Unity did not have any employment *relationship* with the beneficiaries assigned

to it," Defendants' Objection at 2 (emphasis added), indicates that the defendants confuse a finding of fact (the beneficiaries formerly worked for Unity's predecessors) and a conclusion of law (the liability imposed by the Coal Act lacks a constitutionally sufficient connection to that employment). The Report and Recommendation at 837 states plainly: "Unity was assigned beneficiaries on the basis that the beneficiaries, or their deceased parents or spouses in the case of survivor beneficiaries, had last worked for South Union (Pennsylvania) or South Union (West Virginia) pursuant to a NBCWA."

Defendants and the United States further assert that the Report and Recommendation "mischaracterizes the Coal Act as a 'retroactive' statute." Defendants' Objections at 8; *see also* id. at 32; United States' Objections at 6–7; United States Brief in Support of Objections at 45–50. While the Takings Clause analysis of the Coal Act would be for all practical purposes the same whether it was a retroactive statute or not, the Report and Recommendation did not characterize the Coal Act as retroactive. The term retroactive appears in the Report and Recommendation twice to describe the tax statute upheld in *United States v. Carlton*, —— U.S. ——, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994), in quotes from *Carlton*, Justice O'Connor's concurring opinion in *Carlton*, and Justice O'Connor's concurring opinion in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 228–36, 106 S.Ct. 1018, 1027–31, 89 L.Ed.2d 166 (1986), and once in a footnote in the portion of the Report and Recommendation that found in favor of the defendants on the Due Process Clause attack to note that even legislation loosely described as retroactive had long been held valid despite attacks under the Due Process Clause.

Those straw objections aside, I turn to the genuine objections to the Report and Recommendation.

*Objections*

The defendants point out that of the beneficiaries assigned to Unity pursuant to the Coal Act, 63 were miners who previously

---

5. The fact that no "truly orphaned" miners are assigned to Unity would also make any challenge

to the constitutionality of such an assignment unripe.

worked an average of nine years for Unity's predecessors in the coal business, and that for more than half of these miners, a Unity predecessor was the beneficiary's last employer in the coal industry. Defendants also reiterate what was not in dispute originally, namely that Unity's coal-mining predecessors were signatories to NBCWAs from 1950 through 1981.

The United States and defendants' legal arguments may be summarized in four points, from least to most meritorious:

1) four district courts have rejected Takings Clause challenges to the Coal Act, Defendants' Objections at 4, United States Brief in Support of Objections at 2;

2) The Supreme Court observed in *Concrete Pipe and Products, Inc. v. Construction Laborers Pension Trust*, —— U.S. ——, ——, 113 S.Ct. 2264, 2289, 124 L.Ed.2d 539, 576 (1993), that if the statute challenged in that case did not violate the substantive component of the Due Process Clause " 'it would be surprising indeed to discover' the challenged statute nonetheless violat[es] the Takings Clause." (internal quote from *Connolly*, 475 U.S. at 223, 106 S.Ct. at 1025). The objectors would assert from this that statutes that pass muster under substantive due process analysis thereby also withstand Takings Clause challenges. Defendants' Objections at 9–10, United States Brief in Support of Objections at 20–21;

3) The Coal Act does not take any property for government use, but only requires the payment of money for health benefits for private citizens. United States' Brief in Support of Objections at 20–21, 23–25.

4) i. Unity's coal mining predecessors employed the beneficiaries (or some employee related to the beneficiary) pursuant to one or more NBCWA's which set up multiemployer health benefits funds, and made contributions to those funds, the UMWA 1950 Benefit Trust, the UMWA 1974 Benefit Trust, and

their predecessors, according to a formula based on the number of tons of coal mined (the original 1950 Benefit Plan) or hours worked (1974 Benefit Plan and 1950 Benefit Plan under more recent NBCWAs) by UMWA members. Defendants contend that Unity and its predecessors "even after they discontinued participation" in the multiemployer plans "received and accepted the benefits provided by the coal industry's multiemployer benefit system." Defendants' Objection at 18.

ii. By 1978 the UMWA and BCOA had restructured the benefit plans as more coal operators dropped out of participation in NBCWAs and the multiemployer plans: the 1950 Benefit Plan continued to provide health benefits for UMWA retirees in 1975 and earlier, while health benefits for UMWA retirees in 1976 and afterwards were the responsibility of single employer plans established by the miner's employer, unless the employer was "no longer in business." Coal Commission Report at 32. Liability for health benefits for those retirees would be provided by the 1974 Benefit Plan, funded by signatories to NBCWAs. As the number of signatories to current NBCWAs plummeted from approximately 5000 to about 300, the strain on this Plan grew [6], even though it was considered well-funded by actuarial standards. *See* House Ways and Means Committee Report, 103d Congress, 1st Sess., Financing UMWA Coal Miner "Orphan" Retiree Health Benefits, (Ways and Means Report), Exhibit A to Objections of the United States, at 14. This strain was aggravated by court decisions which held that the Plans had the duty to provide lifetime benefits to retirees, *see United Mine Workers Int'l Union v. Nobel*, 720 F.Supp. 1169 (W.D.Pa.1989), *aff'd w/o op.*, 902 F.2d 1558, *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991), and court decisions holding that former signatories to pre–1978 NBCWAs did not have any obligation to continue to contribute to

---

**6.** Congress responded to this problem, which affected multiemployer plans far beyond the coal industry, in the Multi–Employer Pension Plan Amendments Act of 1980. Withdrawal liability to a multiemployer plan for coal operators leaving the industry is assessed under MPPAA, *see e.g. Vipond & Vipond, Inc. v. UMWA 1950 and*

*1974 Pension Plans*, 15 E.B.C. 2037, 1992 WL 266000 (W.D.Pa.1992). Defendants assert that South Union (West Virginia), the last surviving Unity predecessor and signatory to the 1978 and 1981 NBCWAs, was never assessed withdrawal liability at all. Defendants' Objections at 21.

the Plans after leaving the industry. *See In re Chateaugay Corp.*, 945 F.2d 1205 (2d Cir. 1991) *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992); *District 29, UMWA v. Royal Coal Co.*, 768 F.2d 588 (4th Cir.1985). *See* Ways and Means Report at 48–49. Defendants' Objections at 18–22, United States Brief in Support of Objections at 9–10.

iii. Congress created two funds in the Coal Act, the Combined Fund to assume the provision of health care benefits provided by the 1950 Benefit Plan and 1974 Benefit Plan, and the UMWA 1992 Benefit Plan to provide benefits to retirees not receiving health care benefits from the Combined Fund or pursuant to an individual employer plan. 26 U.S.C. § 9712(b). To fund these plans, Congress rejected imposing a tax on the coal industry generally, rejected a limited reachback to those companies which had signed a NBCWA since 1978 (when evergreen clauses were introduced) and determined to impose liability on any successor to any company that had signed any NBCWA since 1950 under a "super-reachback provision." Ways and Means Report at 55. The defendants refer to this as "the narrower approach." Defendants' Objections at 27–28. The rationale offered by Congress was "those companies which employed the retirees in question, and thereby benefitted from their services, will be assigned responsibility for providing the health care benefits promised in their various collective bargaining agreements." Defendants' objections at 28, *quoting* 138 Cong.Rec. § 17603 (October 8, 1992).

iv. Unity's obligations are proportionate to benefits its predecessors received from the labor of beneficiary coal miners, United States' Brief in Support of Objections at 29–33, and the "benefit of having its retirees and

former employees receive benefits from the multiemployer funds for many years after the Unity companies ceased making contributions to the funds." Defendants' Objections at 31.

Addressing the objections in order, plainly the decisions of the district courts that have considered challenges to the Coal Act and affirmed its constitutionality, in some cases with reservations, *Blue Diamond Coal Co. v. Shalala*, 174 B.R. 722 (E.D.Tenn.1994); *LTV Steel Co. v. Shalala*, 163 B.R. 955 (S.D.N.Y. 1993); *Templeton Coal Co. v. Shalala*, 855 F.Supp. 990 (S.D.Ind.1993); *Barrick Gold Exploration, Inc. v. Hudson*, 823 F.Supp. 1395 (S.D.Ohio 1993), are not controlling, although consistent rulings are of special importance in matters affecting nationwide social welfare programs. *Butler County Memorial Hospital v. Heckler*, 780 F.2d 352, 357 (3d Cir.1985).

Second, the quotation from Justice Souter's opinion for the Court in *Concrete Pipe*, which borrowed a sentence fragment from an inapposite sentence in *Connolly* [7], is too slender a reed on which to base the novel theory that the Takings Clause is redundant of the Due Process Clause. In *Concrete Pipe* itself, of course, the Court analyzed the Takings Clause challenge separately from the due process attack. More generally, constitutional jurisprudence is moving in the opposite direction, as an appreciation for conceptual rigor causes the Court to abandon the fuzzy substantive due process rationale in area after area and tie its decisionmaking to a explicit constitutional text [8]. If anything, the substantive due process analysis is superfluous in the analysis of the Coal Act. Most to the point, the Court itself has stated "[There] is no reason to believe ... the standards for

---

7. Justice White's opinion for the Court in *Connolly*, conveying the idea that substantive due process precedents were relevant in analyzing Takings Clause challenges, stated "Although *Gray* and *Turner Elkhorn* were due process cases, it would be surprising indeed to discover now that in both cases Congress unconstitutionally had taken the assets of the employers there involved."

8. For three of many such instances, the Court has moved from relying on so-called substantive due process in favor of the relevant constitution-

al amendment in police excessive force claims, *cf. Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), *with Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), search and seizure claims, *cf. Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), *with Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), and prison civil rights claims *see Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

takings challenges [and] due process challenges ... are identical." *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

With the third listed objection, the objectors begin to pose objections requiring careful consideration. As the Court has stated, Takings Clause analyses, although each one is *ad hoc,* give particular significance to three factors: 1) the economic impact of the regulation on the claimant; 2) the extent to which the regulation has interfered with distinct investment-backed expectations, and 3) the character of the government action. *Connolly,* 475 U.S. at 224–25, 106 S.Ct. at 1025–26. That the Coal Act does not take Unity's property for the United States' use [9], but rather requisitions it to fund the health benefits of UMWA retirees, is relevant to the third factor, the nature of the government action. Upon examination, however, this factor does not help the objectors' argument.

For the proposition that Unity does not suffer a taking because only its money is being taken, the United States quotes *Atlas Corp. v. United States,* 895 F.2d 745, 746 (sic: the quote by the United States is at 756), (Fed.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990), "[r]equiring money to be spent is not a taking of property." This is a rather broad reading by the Federal Circuit of *United States v. Sperry Corp.,* 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 395 n. 9, 107 L.Ed.2d 290 (1989). That portion of *Sperry Corp.* unsurprisingly turned back the claim that the deduction of a percentage of a monetary award *as a fee for services* could be analogized to the physical occupation of real property.

The significance of the "character of the government action" prong of the takings analysis was explained in *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Court observing that if the government action led to a permanent physical invasion of a property interest or the denial of all economically beneficial use of land, a taking requiring

compensation has invariably been found. Some of the Supreme Court's takings jurisprudence has been formalistic, finding a *per se* taking when the character of the government action permitted a permanent physical occupation of a minimal nature, *e.g. Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), while rejecting a conclusion of taking where purely intangible legal rights of much greater value have been affected, *e.g. Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Even so, this *per se* test neither logically nor legally implies that a government taking of money by the imposition of liability for health benefits does not constitute a taking. Therefore, the question whether a taking of money can be a constitutional taking must be answered on its own merits.

And it is quickly answered. The Court unanimously held, in *Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), that Florida's statute appropriating interest on interpleader funds paid into court effected an unconstitutional taking.

To answer the second strand of the objection even more succinctly, the Court has repeatedly held that takings occur even when the government does not formally acquire property for its own use, but for the use of third parties. *See Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (escheat of fractional Indian land allotments to tribe); *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1013–16, 104 S.Ct. 2862, 2878–79, 81 L.Ed.2d 815 (1984) (EPA disclosure of mandatorily registered trade secrets; equitable relief denied because compensation provided in Tucker Act suit).

We come therefore to the heart of the matter, whether the burdens of funding the shortfall in UMWA health benefits are "burdens which, in all fairness and justice, should be borne by the public as a whole." *Dolan v. City of Tigard,* —— U.S. ——, ——, 114 S.Ct.

---

9. The plaintiff asserts that the Coal Act does take its property for the use of the United States because the assets of the Combined Fund are included in the federal budget. *See* Unity Real Estate's Proffer of Additional Evidence, docket no. 28. I do not regard this evidence as tending to prove that Unity's property is taken for the benefit of the United States.

2309, 2316, 129 L.Ed.2d.304, 316 (1994), *quoting Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Unity of course argues that it is. The defendants and the United States argue that the burden can be placed on Unity because 1) Unity's predecessors participated in the coal industry's multiemployer health plan system, accepted the system's benefits, and contributed to the system's problems; 2) there was an employment relationship between Unity's predecessors and the beneficiaries assigned to Unity proportionate to Unity's liability for benefits under the Coal Act; and 3) there has at least since 1946 been a special federal involvement in the health benefits plans of UMWA coal miners, and Congress in legislating in this field is not bound by the contractual limitations of the NBCWAs. Any one of these three arguments, if valid, is sufficient to defeat a Takings Clause challenge to the Coal Act.

*Unity's acceptance of the benefits of multiemployer plans*

There is no dispute that Unity's predecessors participated in multiemployer plans. The United States argues that this benefited Unity's predecessors in the past, *see* United States Brief in Support of Objections at 42, relying on the finding by the *Templeton* court that "[coal companies] benefitted from the pool of UMWA workers ... The availability of health-care benefits may have contributed to the existence of that workforce pool." 855 F.Supp. at 1002. This argument and its premise are completely at odds with all law. Of course the existence of health benefits, compared to employment at slave wages without benefits, made UMWA employment attractive and thereby contributed to the existence of a labor pool [10], but attaching legal significance to this is semantic legerdemain unworthy of legal analysis. There seems to be no recognition by the *Templeton* court or the United States that those past benefits were funded, as contractually required, by the employer, as its half of the

mutually advantageous contract, *i.e.* as its consideration or detriment. Wages and benefits paid, directly or indirectly, to the employee by the employer cannot be legally considered benefits to the employer, or the absurd conclusion is compelled that if an employer provides benefits to its employees worth ten million dollars per year and has prospective employees lining up around the block, *it* is somehow receiving a tremendous benefit, while a employer who pays no benefits and obtains only the marginal laborer does not. Of course Unity's predecessors benefited from their economic relationship with their employees and of course multiemployer benefits plans were part of that relationship. But it is not even sound logic, much less good law, to hold that the use of the multiemployer plans, which is something the employee received from the relationship, is a benefit to the employer.

The United States and the defendants do not rest there, however, but go on to argue that Unity and its predecessors "even after they discontinued participation" in the multiemployer plans "received and accepted the benefits provided by the coal industry's multiemployer benefit system." Defendants' Objection at 18. This assertion of fact rests on a view of the law never accepted in Anglo–American jurisprudence, that is, that Unity should fund health benefits under the Coal Act because it somehow receives some kind of unearned ongoing benefit from its predecessors' past funding under past NBCWAs of the multiemployer plans incorporated into the Combined Fund. Neither the defendants nor the United States attempt to argue this point. To repeat, the employee, not the employer, receives the legal benefit from the wages and benefits of the employment relationship.

*Unity's liability is proportionate to the benefit it received from the employment relationship*

"[T]hose companies which employed the retirees in question, and thereby benefitted

---

10. The *Templeton* court's statement suffers from an additional elementary flaw in economic analysis, that of failing to maintain *ceteris paribus*. Other things equal, the existence of health-care benefits is more likely to attract prospective employees. Not all employees prefer or preferred health care benefits to higher current wages, or higher pensions, or some other mix. Since the

money coal companies paid to fund health benefits is money they did not have to pay higher wages or other goods, a valid comparison the *Templeton* court and United States could have made is between the past labor pool in comparable industries with different packages of benefits. The economic flaw is overshadowed by the legal one.

from their services, will be assigned responsibility for providing the health care benefits promised in their various collective bargaining agreements." Defendants' objections at 28, quoting 138 Cong.Rec. S17603 (October 8, 1992). Even a very rough equivalence between past employment and the burden imposed by the Coal Act would satisfy the Takings Clause. *Dolan v. City of Tigard,* —— U.S. at ——, 114 S.Ct. at 2319, 129 L.Ed.2d at 320 ("rough proportionality"). Even that rough equivalence is absent.

It is important to realize that the burden imposed by the Coal Act, to pay for whatever general health benefits the Combined Plan will provide to beneficiaries, has no connection to the past employment of the beneficiaries, even when those beneficiaries themselves were employed by Unity's predecessors. Prior employment merely identifies the class of retirees which is assigned to Unity. Prior employment did not create a need for dental services, emergency treatment, radiation therapy, and so on, *see* Coal ·Commission Report at 35 *et seq.*: the beneficiaries' status as mortal human beings did. By contrast, *Turner Elkhorn Mining Co.* relied on the fact that imposing liability for black lung disease satisfied a "specific need created by the dangerous conditions under which the former employee labored," 428 U.S. at 19, 96 S.Ct. at 2894, and did "not simply [ ] increase or supplement a former employee's salary." *Id.* In economic reality, the burden imposed on Unity and benefit provided to the beneficiaries by the Coal Act, payment for health care, is no different than requiring Unity to pay the beneficiaries outright cash grants equivalent to the cost of premiums. Unless the Court's decisions no longer "leave open the possibility that the imposition of retroactive liability on employers for the benefit of employees may be arbitrary and irrational in the absence of any connection between the employer's conduct and some detriment to the employee." *Connolly v. Pension Benefit Guaranty Corp.,* 475

U.S. 211, 229, 106 S.Ct. 1018, 1028, 89 L.Ed.2d 166 (1986) (concurring opinion of O'Connor, J.), the Coal Act cannot be sustained on some proportionality of benefit theory.

Nor did the prior employment relationship create any legitimate expectation of lifetime benefits from Unity or its predecessors once they had left the coal industry. A significant reason for the Coal Act is precisely this failure of the trustees of the former benefit plans to establish that proposition judicially, while the benefit plans were faced with judicial decisions holding that retirees had an expectation of lifetime benefits from them. The United States, in its Brief in Support of Objections at 44, argues that the lifetime expectation of benefits from Unity was created by South Union (West Virginia)'s signing of the 1978 and 1980 NBCWAs, which contain evergreen clauses [11]. At the outermost, however, evergreen clauses were interpreted (in a case to which Unity was not apparently a party, some years after Unity left the coal industry) to impose a continuing (not perpetual) obligation to contribute to the 1950 Pension Plan and the 1974 Pension Plan even though a signatory to a NBCWA containing an evergreen clause dropped out of the BCOA *but* continued to mine coal under a agreement with the UMWA without being bound by a current NBCWA. *See UMWA 1974 Pension v. Pittston Co.,* 984 F.2d 469 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 3040, 125 L.Ed.2d 726 (1993). The lower court history of *Pittston* is clear on this point, *see In re UMWA Employee Benefit Plans Litigation,* 782 F.Supp. 658, 673 (D.D.C.1992), *aff'd UMWA 1974 Pension v. Pittston Co.,* 984 F.2d 469 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 3040, 125 L.Ed.2d 726 (1993), the court recognizing that MPPAA withdrawal liability was typically the way the plans assessed liability from employers leaving the coal industry. As the United States also recognizes in a footnote, United States Brief in Support of Objections

11. Even if the United States' argument on this point were correct it would not justify the attribution of liability to Unity for the great majority of beneficiaries whose service ended before 1978. *See* Declaration of Kyu W. Lee, docket no. 33 (summaries of service histories). It is also worth noting that the liabilities of South Union (West Virginia) were adjudicated in the bankruptcy proceeding in 1980 or 1981. The Coal Act, in addition to the legal effects discussed in the text above, overrides any reliance by Unity on previously established bankruptcy laws.

at 45 n. 12, the evergreen clauses can have no relevance to employers like Unity who go out of the coal business because the duty to contribute is based on tons of coal mined or hours worked in mining operations.

*The strong federal interest in this field precludes reliance on contractual limitations of liability*

Quoting from *Connolly*, 475 U.S. at 223–24, 106 S.Ct. at 1025, the United States suggests that the absence of contractual liability for Unity does not shield it from Congress' power to regulate interstate commerce, United States Brief in Support of Objections at 40–41, or alter the basis of its liability to the multiemployer plans established by the NBCWAs from contributions based on its coal mining activity to a simple assignment of beneficiaries based on past employment, United States Brief in Support of Objections at 45 n. 12.

Although the citation to *Connolly* is accurate, it is inapposite. *Connolly* involved a facial challenge only to the MPPAA's statutory imposition of the burden on employers withdrawing from a multiemployer benefit plan to pay a fixed proportionate share of the plan's unfunded vested benefits liability. Justice O'Connor's concurrence makes it very clear that the Court was not considering a challenge to the more questionable applications of MPPAA, for example imposition of liability for unfunded benefits that had accrued in the past, 475 U.S. at 228–29, 106 S.Ct. at 1027–28, and suggests that there would be a substantial Takings Clause challenge to such an action. That Takings Clause challenge was presented to the Court in *Concrete Pipe*, the Court finding constitutional the imposition of fixed liability under MPPAA to an employer withdrawing from a multiemployer plan *after* the date MPPAA became effective, —— U.S. at ——–——, 113 S.Ct. at 2275–76, 124 L.Ed.2d at 559, despite the resulting increase in the employer's liability above that provided in ERISA when it entered the plan. —— U.S. at ——–——, 113 S.Ct. at 2291–92, 124 L.Ed.2d at 579.

From these garden variety cases the United States and defendants attempt to extract the principle that Congress can impose a general unfixed liability under the Coal Act on a company whose predecessor left the relevant industry and ceased to have any liability to contribute to the multiemployer benefit plans more than a decade earlier. The United States observes that it was foreseeable (at some undefined point [12]) that a legislative solution to the UMWA's benefits plans' ills might be imposed, United States Brief in Support of Objections at 41, and that it was foreseeable (at the time Unity's predecessors ceased mining coal) that the coal industry might one day change the funding mechanism for coal retirees' benefits, id. at 44 n. 12. It concludes that Unity could foresee (i.e. could have no reasonable expectations to the contrary) that the Congress might impose liability on it based on the number of miners its predecessors once employed. This defies law as well as logic.

The possibility that the BCOA and UMWA might someday alter the contribution formula after Unity's predecessors left the coal industry naturally would be a matter of complete disinterest to Unity, given that no judicial decision, regulation, or statute prior to the Coal Act made Unity's predecessors liable for continuing contributions to the coal industry's plans. And if the possibility of a decade-later legislative solution to a crisis makes the imposition of liability on Unity on some basis chosen by Congress constitutionally foreseeable, then the expectations prong of Takings Clause analysis ceases to exist, because legislation can always be foreseen. The Court's discussion of the impact on expectations of foreseeable legislation in *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 730–31, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984), in the context of a challenge to the retroactive provisions of MPPAA, suggests that imposition of liability based on actions by the employer in the "short and limited" period prior to the statute's effective date was justified by

12. At a general level of abstraction, which would favor the Coal Act, Congress has extensively legislated in matters affecting the coal industry since World War II. The precise legislation at issue, however, could hardly be called foreseeable until roughly the period of the Pittston strike and formation of the Coal Commission (1989–90), again long after Unity's predecessors had left the industry. *See* Ways and Means Report at 44, 52–56; Coal Commission Report at 28.

potential evasion of the statute by employers aware of congressional action while the statute was actually pending in Congress. To expand that reach to a period in excess of a decade goes far beyond any constitutional power of Congress.

I adhere to my recommendation that a preliminary injunction issue against the operation of the Coal Act to Unity.

Pursuant to 28 U.S.C. § 636(b)(1), the parties are given notice that they have ten days to serve and file written objections to this Report and Recommendation.

DATE: 11 January 1995